## STATE OF WASHINGTON *v.* STATE OF OREGON.

### ORIGINAL, IN EQUITY.

No. 3.   Argued January 8, 9, 1908.—Decided November 16, 1908.

Congress cannot change the boundary of a State without its consent.

In the absence of specific statement to that effect, the middle of a river, or the middle of the main channel of a river, is not necessarily the exact line when such river separates two States, and where the boundary is properly established in the center of a particular channel, it so remains, subject to changes by accretion, notwithstanding another channel may become more important and be regarded as the main channel of the river.

The fact that the south channel of the Columbia River has become more important than the north channel has not changed the boundary between the States of Oregon and Washington as fixed by the act of February 14, 1859, c. 33, 11 Stat. 383, admitting Oregon to the Union; and that boundary at Sand Island is the center of the north channel of the Columbia River, subject only to changes by accretion.

The boundary line between Oregon and Washington established as indicated on maps annexed to the opinion.

In boundary cases where both parties are alike interested the costs are equally divided between them.

THIS is an original suit, commenced in this court on Feb-

ruary 26, 1906, by the State of Washington against the State of Oregon, to determine their boundary line. Pleadings were filed, testimony taken before a commissioner by consent of the parties, and on these pleadings and proofs the case has been. argued and submitted. The maps or charts accompanying this opinion have been prepared from exhibits filed by the parties, and will aid to an understanding of the case.

A brief chronological statement is that on August 14, 1848, the Territory of Oregon was established, c. 177, 9 Stat. 323, and on March 2, 1853, 'the Territory of Washington, including all that portion of Oregon Territory lying north of the middle of the main channel of the Columbia River. C. 90, 10 Stat. 172. On February 14, 1859, Oregon was admitted into the Union. The boundary, so far as is important in this controversy is as follows. C. 33, 11 Stat. 383:

"Beginning one marine league at sea due west from the point where the forty-second parallel of north latitude intersects the same; thence northerly, at the same distance from the line of the coast, lying west and opposite the State, including all islands within the jurisdiction of the United States, to a point due west and opposite the middle of the north ship channel of the Columbia River; thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the .middle of the widest channel thereof,. to a point near Fort Walla Walla."

On February 22, 1889, an act was passed providing for the admission of Washington. C. 180, 25 Stat. 676. On November 11, 1889, the President, as authorized by § 8, of the statute last referred to, issued his proclamation, declaring Washington duly admitted into the Union. 26 Stat. 1552. The material part of the boundary described in the constitution of that State is—

"Beginning at a point in the Pacific Ocean one marine league due west of and opposite the middle of the mouth of the north ship channel of the Columbia River, thence running easterly to and up the middle channel of said river and where

it is divided by islands up the middle of the widest channel thereof to where the forty-sixth parallel of north latitude crosses said river, near the mouth of the Walla Walla River." Art. XXIV, § 1; Hill's Stats. & Codes of Washington, vol. 2, p. 851.

*Mr. E. C. Macdonald,* with whom *Mr. John D. Atkinson,* Attorney General of the State of Washington, *Mr. Samuel H. Piles, Mr. A. J. Falknor* and *Mr. J. B. Alexander* were on the brief, for complainant:

The true boundary line is the varying center or middle of that channel of the river which is best suited and ordinarily used for the purposes of navigation. This proposition is conclusively sustained by decisions of this court. *Nebraska v. Iowa,* 143 U. S. 359, where the following cases and works are cited: *New Orleans v. United States,* 10 Pet. 662, 717; *Jones v. Soulard,* 24 How. 41; *Banks v. Ogden,* 2 Wall. 57; *Saulet v. Shepherd,* 4 Wall. 502; *St. Clair v. Lovingston,* 23 Wall. 46; *Jeffries v. East Omaha Land Co.,* 134 U. S. 178; Angell on Water Courses; Gould on Waters, § 159; *Trustees v. Dickinson,* 9 Cush. 544; *Buttenuth v. St. Louis Bridge Co.,* 123 Illinois, 535; *Hagan v. Campbell,* 8 Porter (Alabama), 9; *Murray v. Sermon,* 1 Hawks (Nor. Car.), 56. When a navigable river constitutes the boundary between two independent States, the line, defining the point at which the jurisdiction of the two separates, is well established to be the middle of the main channel of the stream. The preservation by each of its equal right in the navigation of the stream is the subject of paramount interest. It is therefore laid down in all the recognized treatises on international law of modern times that the middle of the channel of the stream marks the true boundary between the adjoining States up to which each State will on its side exercise jurisdiction. *Iowa v. Illinois,* 147 U. S. 1.

The same doctrine was announced and followed in *Missouri v. Nebraska,* 196 U. S. 23. See also *Louisiana v. Mississippi,* 202 U. S. 1 (p. 49).

*Mr. A. M. Crawford,* Attorney General of the State of Oregon, with whom *Mr. I. H. Van Winkle, Mr. Harrison Allen, Mr. C. W. Fulton* and *Mr. A. M. Smith* were on the brief, for defendant:

Assuming our position, on the facts, as to the position of the line as established by the act admitting Oregon into the Union, to be correct, it follows that the line must remain the same unless it has been changed by consent of the State of Oregon, or under the doctrine of accretion as defined by this court.

It was held in the case of *Indiana* v. *Kentucky,* 136 U. S. 479, in substance, that after the boundaries of a State are established by act of Congress and the State admitted as a member of the Union of States, such boundary cannot be changed without the consent of such State, except by accretion as before stated. The decision of the court is stated in the syllabus as follows:

"The dominion and jurisdiction of a State, bounded by a river, continue as they existed at the time when it was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river."

The above doctrine is sustained by the following cases: *Missouri* v. *Kentucky,* 11 Wall. 401; *Nebraska* v. *Iowa,* 143 U. S. 359, and cases cited.

The doctrine of the *Nebraska-Iowa case* is approved in *Shively* v. *Bowlby,* 152 U. S. 36.

The same doctrine is supported by the following authorities: Bishop's New Criminal Law, § 150; *Coulthard* v. *Stevens,* 35 American State Reports, 304, and note 307; Opinions of Attorney General (U. S.), vol. 8, p. 175; *Hagan* v. *Campbell,* 33 Am. Dec. 267, and note 276; *Mulry* v. *Norton,* 100 N. Y. 424, 429; *S. C.,* 53 Am. Rep. 206, and note 215.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The northern boundary of the State of Oregon was estab-

lished prior to that of the State of Washington, and it is not within the power of the National Government to change that boundary without the consent of Oregon.　Nor, indeed, was there any attempt to change it.　The same description is found in both the act admitting Oregon and in the constitution of Washington, under which that State was admitted. It will be perceived that the starting point in the line running up the Columbia River is a point "due west and opposite the middle of the north ship channel of the Columbia River." This language implies that there was more than one channel, and the middle of the north channel was named.　There were at that time two channels, and the northerly one ran to the north of what is called "Sand Island."　This is shown by abundant testimony, and is admitted by counsel for complainant.　At that time the north channel was perhaps the better one—at least one quite generally used by vessels passing in and out of the river, although the quantity and direction of the wind was an important factor.　It is true there has been no little variation in the channels at and near the entrance as might be expected considering the great width of the mouth and the sandy character of the soil underneath a large part of the river.　The earliest known chart is a sketch made in 1792 by Admiral Vancouver, which does not show Sand Island, but discloses two inside channels uniting and crossing the bar into the ocean with a depth of twenty-seven feet.　Chart "A," made by the United States authorities in 1851, shows the condition of the mouth of the river as it then existed.　The two channels are plainly disclosed.　The brown color indicates land above low-water mark; the yellow, water of 18 feet in depth or less, and the white, water over 18 feet in depth.　See notation at the upper left hand corner.　The existence of the two channels clearly opened the way for a selection of one as the boundary, and the north one was adopted.　Sand Island appears as a small body of land surrounded by shoal water. Another chart was prepared in 1854, which of all the charts and maps is the nearest in point of time to the admission of

Oregon.  On this, as in Chart "A," Sand Island is shown, and
the two channels, one north and the other south of the island.
It is called an island, but it was little more than a sand bar.

By the action of the waters it had been gradually moving
northward, but the general configuration of the mouth of the
river was unchanged.  Since then the movement of Sand

WASHINGTON

OREGON

CHART A

MOUTH OF
COLUMBIA RIVER

Island has continued, the north channel has been growing more shallow, and the southern channel has become the one most used. The movements of Sand Island and the changes in the entrance are shown in Chart "B."

Looking only at the description of the boundary in the act one might think that there were three channels, north, south and middle, but it is quite apparent, from the testimony that there were but the two. The meaning would be more clear if the language was "easterly to and up the middle of said channel," and that that was the intent of Congress is, we think, obvious; first, because there were only two channels; second, to locate a starting point on the west line in the ocean opposite the middle of one channel and thence run the boundary up the middle of another channel would hardly be expected. If the middle of the northern channel was intended to be the dividing line between Oregon and the territory north, it would be natural to fix the point of starting in the ocean west of the center of that channel. Further, that the channel north of Sand Island was the one intended as the boundary between Oregon and the territory north of it is made more clear by this fact:

On October 21, 1864, Oregon passed an act granting to the United States—

"all right and interest of the State of Oregon, in and to the land in front of Fort Stevens and Point Adams, situate in this State, and subject to overflow between high and low tide, and also to Sand Island, situate at the mouth of the Columbia River in this State; the said island being subject to overflow between high and low tide.

"SEC. 2. The Governor of this State shall cause two copies of this act to be prepared and certified under the seal of this State, and forward one of such copies to the Secretary of War of the United States, and the other of such copies to the commanding officer of this district of the military department of the Pacific Coast." Special Laws of Oregon, 1864, p. 72.

Now this act was passed shortly after the admission of Oregon and indicates the understanding both of the State of Oregon

and the United States that the boundary was through the
channel north of Sand Island. It is a recognition of Oregon's
title to that island and an acceptance by the United States of a
grant from that State.

While all this is not in terms admitted by counsel for com-
plainant, yet the burden of their principal contention impliedly
does so, for they say:

"The proof will disclose the fact that there have been various
channels in the Columbia River which have gradually, im-
perceptibly and continuously changed and shifted. There has
been at no time such a change as to come within the definition
of avulsion. The contention of the complainant is that the true
boundary line is the varying center or middle of that channel of
the river which is best constituted and ordinarily used for the
purposes of navigation. . . . The line claimed by the de-
fendant commences at a point which is alleged to have been the
middle of the North Ship channel of the river as it existed in
1859 (the year in which Oregon was admitted into the Union),
and follows certain channels supposed to exist in that year
throughout the portion of the river in controversy."

In support of their contention counsel refer to: *Nebraska* v.
*Iowa*, 143 U. S. 359; *Iowa* v. *Illinois*, 147 U. S. 1; *Louisiana* v.
*Mississippi*, 202 U. S. 1. To these may be added *Missouri* v.
*Nebraska*, 196 U. S. 23, 35.

But in these cases the boundary named was "the middle of
the main channel of the river," or "the middle of the river,"
and it was upon such a description that it was held that in the
absence of avulsion the boundary was the varying center of the
channel. But there is no fixed rule making that the boundary
between States bordering on a river. Thus, the grant of Vir-
ginia, of all right, title and claim which the said commonwealth
had to the territory northwest of the River Ohio, was held to
place the boundary on the north bank of the river. *Handly's
Lessee* v. *Anthony*, 5 Wheat. 374, in which the subject is dis-
cussed by Mr. Chief Justice Marshall. See also *Howard* v. *Inger-
soll*, 13 How. 381. Now, if Congress in establishing the bound-

ary between Washington and Oregon had simply named the middle of the river, or the center of the channel, doubtless it would be ruled that the center of the main channel, varying as it might from year to year through the processes of accretion, was the boundary between the two States. That Congress had the propriety of such a boundary in mind is suggested by the terms of the act establishing the territorial government of Washington, passed March 2, 1853, c. 90, 10 Stat. 172, in which "the middle of the main channel of the Columbia River" was named as the boundary. However, as we have seen, when Congress came to provide for the admission of Oregon (doubtless from being more accurately advised as to the condition of the channels of the Columbia River) it provided that the boundary should be the middle of the north channel. The courts have no power to change the boundary thus prescribed and establish it at the middle of some other channel. That remains the boundary, although some other channel may in the course of time become so far superior as to be practically the only channel for vessels going in and out of the river. It is true the middle of the north ship channel may vary through the processes of accretion. It may narrow in width, may become more shallow, and yet the middle of that channel will remain the boundary. This is but enforcing the idea which controlled the decisions in the prior cases referred to, the difference springing out of the fact that here there were two instead of but one substantial channel. Aside from the fact that any other rule would be ignoring the action of the Government in prescribing the boundary—the intention in respect to which was in effect confirmed by the conveyance from Oregon to the United States of Sand Island and adjoining lands—there would be this practical difficulty. At the time of the admission of Oregon both the north and south channels were freely used. The depth of water in each was nearly the same, and the use of either channel depended largely upon the prevailing wind, so that it would be hard to say which was the most important, so surpassing in importance the other as to be properly called the main channel.

Concede that to-day, owing to the gradual changes through accretion, the north channel has become much less important, and seldom, if ever, used by vessels of the largest size, yet when did the condition of the two channels change so far as to justify transferring the boundary to the south channel, on the ground that it had become the main channel? When and upon what conditions could it be said that grants of land or of fishery rights made by the one State ceased to be valid because they had passed within the jurisdiction of the other? Has the United States lost title to Sand Island by reason of the change in the main channel? And if by accretion the north should again become the main channel, would the boundary revert to the center of that channel? In other words, does the boundary move from one channel to the other, according to which is, for the time being, the most important, the one most generally used?

These considerations lead to the conclusion that when, in a great river like the Columbia, there are two substantial channels, and the proper authorities have named the center of one channel as the boundary between the States bordering on that river, the boundary, as thus prescribed, remains the boundary, subject to the changes in it which come by accretion, and is not moved to the other channel, although the latter in the course of years becomes the most important and properly called the main channel of the river.

The testimony fails to show anything calling for consideration in respect to the last clause in the quotation from the boundary of Oregon. The channel is not divided by islands.

Our conclusion, therefore, is in favor of the State of Oregon, and that the boundary between the two States is the center of the north channel, changed only as it may be from time to time through the processes of accretion.

This is one of those cases in which the parties to the suit are alike interested, and, according to the usual rule, the costs will be divided equally between them.