## WHITESIDE v. NORTON.

## NORTON v. TALLAS.

### (Circuit Court of Appeals, Eighth Circuit. March 24, 1913.)

### Nos. 3,780, 3,787.

1. STATES (§ 12*) — BOUNDARIES — CHANNEL OF NAVIGABLE RIVER — "MAIN CHANNEL"—"THALWEG."

The main channel of a navigable stream, called for as a boundary between states, means the "thalweg," or deepest and most navigable channel as it then existed, and there the boundary remains, subject to the changes which come to such channel by the slow processes of erosion and accretion. A sudden change in the channel from natural causes, or a change made artificially by man, does not change the boundary.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. § 12.*]

2. NAVIGABLE WATERS (§ 42*)—STATES (§ 12*)—ISLANDS—TITLE OF RIPARIAN OWNER—CHANGE OF CHANNEL.

A portion of the boundary between the states of Wisconsin and Minnesota was fixed by the enabling acts of Congress as the main channel of the St. Louis river; Wisconsin lying to the south, and Minnesota to the north. A small island formed in the river to the south of the natural main channel, which under the law of Wisconsin was appurtenant to a larger surveyed island to the south of it; and the title vested in the owner of the latter island. The United States government, in the exercise of its power to improve navigation, dredged a new channel to the south of the small island, and between that and the land of the riparian owner, which became the main navigable channel. Held, that such action did not operate to change the boundary between the states, nor to divest the title of the owner and transfer it to the riparian owner on the Minnesota shore.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 253–255; Dec. Dig. § 42;* States, Cent. Dig. §§ 6–11; Dec. Dig. § 12.*]

3. QUIETING TITLE (§ 4*)—REMEDY AT LAW—SUIT TO ESTABLISH TITLE OF RIPARIAN OWNER.

Ejectment will lie by a riparian owner on a navigable stream to recover possession from an adverse claimant of an island formed by accretion in front of his shore line, although the naked title to the bed of the stream where it was formed is in the state, and his right of possession is subject to any proper exercise of the sovereign power of the state in aid of navigation; and, the remedy at law being complete and adequate, a court of equity is without jurisdiction of a suit to determine the rights of the parties.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 5–13; Dec. Dig. § 4.*]

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Suit in equity by George W. Norton, as executor and trustee of the estate of George W. Norton, deceased, against Robert W. Whiteside, E. P. Alexander, and Andrew J. Tallas. Decree for complainant against defendant Whiteside, and he appeals. Reversed. Decree for defendant Tallas, from which complainant appeals. Affirmed.

For opinion below, see 188 Fed. 356.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Luther C. Harris and Alfred Jaques, both of Duluth, Minn. (Theodore T. Hudson, of Duluth, Minn., on the brief), for appellant Whiteside.

Jed L. Washburn, of Duluth, Minn. (William D. Bailey, Oscar Mitchell, and Albert C. Gillette, all of Duluth, Minn., on the brief), for George W. Norton, appellee and appellant.

John B. Richards, Jr., of Duluth, Minn. (Daniel G. Cash, on the brief), for appellee Tallas.

Before HOOK and SMITH, Circuit Judges, and VAN VALKEN-BURGH, District Judge.

VAN VALKENBURGH, District Judge. This is a suit in equity brought by George W. Norton, as executor and trustee, complainant below, against Robert B. Whiteside, E. P. Alexander, and Andrew J. Tallas as defendants. For clearness and convenience, the terms "complainant" and "defendant" will be used in this opinion.

The St. Louis river flows into the western end of Lake Superior; at its mouth it widens into an estuary presenting more than one channel and broad expanses of water, all finally flowing into the lake proper through a natural entry between two points of land called, respectively, Minnesota Point and Wisconsin Point. One of these broader expanses, nearest the main body of the lake, is called "Superior Bay," another to the westward "St. Louis Bay," and a third still farther west "Pokegama Bay." As might be supposed, this estuary contains islands of greater and less size and prominence. The city of Duluth, Minn., with its environments, is situated upon the north shore of these waters, and the city of Superior upon the southern or Wisconsin shore.

The St. Louis river for some distance from its mouth forms the boundary line between the states of Minnesota and Wisconsin. The enabling act, for the admission of the state of Wisconsin, decribed its boundary as running—

"through the center of Lake Superior to the mouth of the St. Louis river, thence up the main channel of said river to the first rapids in the same above the Indian village, according to Nicollet's map."

The later enabling act, for the state of Minnesota, used terms more general, but consistent with the former description. The complainant, Norton, has for many years past been the owner of certain lands located on the northerly or Minnesota shore of these waters, about eight or ten miles above the points forming the natural entry, to which reference has been made. The defendant Whiteside, and his predecessors in title, have for many years been the owners of an island, known as "Big Island," lying south of the lands of Norton, and conceded to be in the state of Wisconsin. The distance between Big Island and the Norton lands is about 2,000 feet. Some time after the survey of Big Island there began to form in the waters between the lands of Norton and Whiteside a smaller island, which has since become a distinct body of land, and which forms the subject-matter of this controversy. At that time, and at all times prior to 1899, and perhaps until 1902, the main natural channel at this point ran within a few hundred

feet of the Minnesota shore, in front of the Norton lands, and north of the small island thus formed between the lands of Norton and Whiteside. This island was claimed by Whiteside as appurtenant to his holding. Several years prior to the commencement of this action the defendant Tallas settled on the small island, which for convenience will be called the "Tallas Island." He built a cabin on it and claims title thereto by adverse possession. Later, in the superior court of Douglas county, Wis., the defendant Whiteside brought suit in ejectment against Tallas, which suit was still pending when the present action was instituted.

In the exercise of its power to improve navigation in the interest of commerce, the government of the United States dredged an artificial channel through these waters, whereby the navigable channel was established south of Tallas Island, and several hundred feet south of the former main natural channel, which ran north of that island. This work was begun in 1899 and completed in 1902. January 27, 1910, complainant filed his bill in the Circuit Court of the United States for the District of Minnesota, at Duluth, charging that, by reason of this change of channel, the cabin of the defendant Tallas intervened between said improved navigable and navigated channel and the shore of complainant's lands, and therefore was infringing upon the riparian rights and privileges of complainant incident and appurtenant to his said lands and estate; that the defendants Whiteside and Alexander also claimed some rights in and to this island as incidental to their ownership of Big Island; that none of defendants, however, had any right, title, or interest in said small island, save only such riparian rights in the defendants Whiteside and Alexander as might be incident or appurtenant to their other lands; that the occupancy of the defendant Tallas, and the claims of all the defendants worked a cloud upon the complainant's title and estate.

Complainant prayed that it be adjudged and decreed that he is the owner in fee simple of his lands upon the Minnesota shore; that the riparian rights and privileges incident thereto, and exclusively thereto belonging, be adjudged and decreed to extend out to the navigable and navigated channel established by the government, as aforesaid, free, clear, and discharged of any claims on the part of the defendants; that it be adjudged, determined, and decreed that neither the defendants, nor any of them, have any right, title, or interest whatsoever in or to the said small island or any lands appearing above the surface of the water lying or being between said improved channel and the shore of complainant's land; that said defendants be restrained from interfering with or impairing the full enjoyment by complainant of the riparian rights and privileges thus claimed by him to be incident to the ownership of his lands on the Minnesota shore, including the full rights of access, wharfage, or other improvements which he might see fit to make to reach out to the said navigable and navigated channel.

The defendant Alexander was made a party as the owner of a small parcel of the land composing Big Island. It was stipulated that his interest should be determined by the decision as to the defendant Whiteside, and for that reason he does not appear in these appeals.

So far as shown by the record, the defendant Tallas is the only party in actual possession of the island in controversy.

The trial court found the issues in favor of the complainant against the defendant Whiteside, but dismissed the suit as to the defendant Tallas, upon the ground that complainant's proper remedy was ejectment. The defendant Whiteside appeals from the decree entered against him, and the complainant appeals from that dismissing the suit against Tallas.

The defendant Whiteside contends that the Circuit Court was without jurisdiction, for the reason that the land in controversy is in the state and district of Wisconsin, and therefore beyond the jurisdiction of the federal court sitting in Minnesota. The complainant denies this, contending that the waters flowing between complainant's and defendants' land are not the St. Louis river, but an arm of Lake Superior; therefore that the terms of the enabling act fixing the boundary line in the middle of the main channel have no application; also that, even though this be the St. Louis river, nevertheless the dredging of the artificial channel by the government operated, in law, to shift the boundary line between the states; that consequently the premises forming the subject-matter of the action are located in Minnesota. The defendant Whiteside maintains that this is the St. Louis river and not an arm of the lake, and that in either event the middle of the main channel is the boundary line. The defendant Whiteside further claims that the title to the bed of the stream, to the center of the main natural channel, and therefore to all islands formed thereon, vested in him by virtue of his ownership of Big Island, and that such title cannot be divested by such artificial and arbitrary processes. This is denied by complainant, who asserts that the shore owner takes no title to the bed of a stream, but that such title vests in the states in their sovereign capacity; that all such titles are subject to the paramount right of the government to improve navigation, even to the extent of changing the boundaries between states, by altering the location of the navigable channel; that complainant's right of access, as a riparian owner, entitles him to extend not only to the natural navigable channel, but to an established navigated channel in front of his lands.

We are of opinion that the body of water at the locus in quo is a part of the St. Louis river—a navigable river, as understood in the law. The reasons leading to this conclusion are several:

(a) The enabling act admitting the state of Wisconsin, and defining its boundaries, thus provided:

"Thence down the main channel of the Montreal river to the middle of Lake Superior, thence through the middle of Lake Superior to the mouth of the St. Louis river, thence up the main channel of said river to the first rapids in the same above the Indian village, according to Nicollet's map."

It is conceded that the St. Louis river flows into Lake Superior at some point. That point is its mouth, and was so well defined to the legislative eye that it was referred to as a natural monument in describing the boundary of the new state. From the exhibits presented, the entry between Minnesota point and Wisconsin point conforms

most logically to this description. There the lake proper has its beginning. It is disclosed in the testimony that through what is called St. Louis Bay the surveys show portions of a channel, at times partially lost, but reappearing through Superior Bay, and continuing with a marked current through the entry and for a considerable distance into the lake. If, however, we eliminate the broader expanses of St. Louis Bay and Superior Bay, still the narrows at Grassy Point would constitute the innermost opening to which the term "mouth of a river" could be applied with any degree of appropriateness, and this is far lakeward from the island in controversy. The witness Darling, government engineer engaged in this harbor improvement, and called on behalf of complainant, testified that above Grassy Point there is a well-defined channel with the characteristics of a river; and such, he pronounced these waters to be.

(b) On Nicollet's map, especially referred to and recognized in this act, the St. Louis river is drawn and indicated as a river down to the lake proper, and far below the wider portion now known as "Pokegama Bay," and on this map as "Pakegomag." This bay lies south of Big Island, and, therefore directly opposite the island and other lands under discussion.

(c) The trial court, upon the facts and with an intimate personal knowledge of the locality, so held, and great weight should be given to this finding of the chancellor.

[1] If this, then, be the St. Louis river, not only is the boundary between Wisconsin and Minnesota declared by legislative enactment to be the middle of its main channel—as that channel then existed—but the doctrine of the "thalweg," meaning the middle, or deepest, or most navigable, channel, is applicable in determining the line of boundary between the two states. Louisiana v. Mississippi, 202 U. S. 1, 26 Sup. Ct. 408, 571, 50 L. Ed. 913. And there the boundary remains, subject to the changes which come to it by the slow and imperceptible processes of erosion and accretion. Washington v. Oregon, 211 U. S. 127, 29 Sup. Ct. 47, 53 L. Ed. 118. The rule of accretions and avulsions, as determining boundaries, applies equally to public and private rights. Missouri v. Nebraska, 196 U. S. 23, 25 Sup. Ct. 155, 49 L. Ed. 372. In the latter case the condition produced by avulsion had existed from 1867 to 1904. Nevertheless, the land theretofore belonging to Nebraska, which had by avulsion been placed on the Missouri side of the river, was held still to be Nebraska land. The Supreme Court said:

"Where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and the boundary remains as it was, in the center of the old channel, although no water may be flowing therein."

It was further held, as in Washington v. Oregon, supra, that Congress, without consent, has no power to change the boundary between states. Still less, does such power exist in an administrative department. Under the conditions here present the doctrine of the thalweg would apply in any event, whether these waters be viewed as those of

a river, or as an arm of the lake. In Louisiana v. Mississippi, supra, the Supreme Court said:

"We are of opinion that, on occasion, the principle of the thalweg is applicable, in respect of water boundaries, to sounds, bays, straits, gulfs, estuaries, and other arms of the sea. As to boundary lakes and landlocked seas, where there is no necessary track of navigation, the line of demarcation is drawn in the middle, and this is true of narrow straits separating the lands of two different states; but whenever there is a deep water sailing channel therein, it is thought by the publicists that the rule of the thalweg applies."

[2] This doctrine was applied in the San Juan water boundary controversy between the United States and Great Britain, and in the Alaskan boundary cases; and in fixing the boundary line of the Detroit river, which is a mere strait in the chain of Great Lakes, the deep water channel was adopted giving Belle Isle to the United States, as lying north of that channel. So that rule unquestionably applies here. Such channel was that existing at the time the boundary was established. The act itself says:

"Up the main channel of said river."

This term now has, in law, a very definite meaning. Prior to the improvement made by the government, the channel answering to this description ran on the north side of the Tallas island. This sufficiently appears from the testimony, is found as a fact by the trial court, and is practically assumed by counsel on both sides in brief and argument. If this be conceded, then this island was, as the court below said, prior to the cutting of this artificial channel, in the state of Wisconsin; if so, it could not be appurtenant to the lands of complainant. Under what we conceive to be a complete harmony of decision in Wisconsin, it was appurtenant to Big Island, and the title thereto was in the owner of the latter island, unless divested by conveyance, by condemnation, or by possession amounting to superior right.

How, then, has this title been affected by cutting the artificial channel along the south side of the Tallas Island? Did this act change the boundary between Minnesota and Wisconsin, and divest Whiteside of whatever rights had accrued to him by virtue of his original riparian ownership? Big Island is conceded to be in the state of Wisconsin.

"The question of the title of a riparian owner is one of local law, and unrestricted grants of the government, bounded on streams and other waters, are to be construed according to the law of the state in which the lands lie. Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428. * * * Where the government has surveyed and patented the lands up to the bank of a channel in which an unsurveyed island is situated, a patentee of the land on such bank, although his land may itself be an island surrounded by two channels of the river, has all the rights of a riparian owner in the channel lying opposite his banks, including the unsurveyed island, if, as a riparian owner, he is entitled thereto by the laws of the state." Whitaker v. McBride, 197 U. S. 510, 25 Sup. Ct. 530, 49 L. Ed. 857.

The latter case dealt with lands of Nebraska, but such is equally the law of Wisconsin. Chandos v. Mack, 77 Wis. 573, 46 N. W. 803, 10 L. R. A. 207, 20 Am. St. Rep. 139; Walls v. Cunningham, 123 Wis. 346, 101 N. W. 696; Sliter v. Carpenter, 123 Wis. 578, 102 N. W. 27; Farris v. Bentley, 141 Wis. 671, 124 N. W. 1003; Kelley v.

Salvas, 146 Wis. 543, 131 N. W. 436. In Hall et al. v. Hobart, 108 C. C. A. 348, 186 Fed. 426, this court held, under the laws of Minnesota, conceded by the trial court to be identical in this respect with those of Wisconsin, and in any view, not more strongly, if so strongly, favorable to the contention of appellant Whiteside, that the riparian owners have possessory rights to the beds and to islands in navigable streams, with the beneficial use or enjoyment thereof, subject only to use for purposes of navigation. Nor are the rights of riparian owners affected by the fact that the stream is a boundary. United States v. Chandler-Dunbar Water Power Co., 209 U. S. 447, 28 Sup. Ct. 579, 52 L. Ed. 881. The language of the Supreme Court in St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941, under the facts there existing, bears directly upon the questions here presented. It was there said:

"By the law of Illinois the title of the plaintiff extended to the middle of the main channel of the Mississippi river. It is a rule of property in Illinois, that the fee of the riparian owner of lands in that state bordering on the Mississippi river extends to the middle line of the main channel of the river. * * * The sudden and perceptible loss of land on the premises conveyed to the plaintiff, which was visible in its progress, did not deprive the grantor of the plaintiff of his fee in the submerged land, nor change the boundaries of the surveys on the river front, as they existed when the land commenced to be washed away. * * * If an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is his property. * * * It is well settled that the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island, or dry land which subsequently may be formed thereon. * * * As the law of Illinois confers upon the owner of land in that state which is bounded by, or fronts on, the Mississippi river, the title in fee to the bed of the river to the middle thereof, or so far as the boundary of the state extends, such riparian owner is entitled to all islands in the river which are formed on the bed of the river east of the middle of its width. That being so, it is impossible for the owner of an island which is situated on the west side of the middle of the river, and in the state of Missouri, to extend his ownership, by mere accretion, to land situated in the state of Illinois, the title in fee to which is vested by the law of Illinois in the riparian owner of the land in that state. We must not be understood as implying that, if an island in the Mississippi river remains stable in position, while the main channel of the river changes from one side of the island to the other, the title to the island would change, because it might be at one time on one side and at another time on the other side of the boundary between two states."

The Supreme Court of Wisconsin in State v. Bowen, 149 Wis. 203, 135 N. W. 494, 39 L. R. A. (N. S.) 200, restates the settled rules governing changes of boundary by erosion or accretion, and declares that states and individuals are subject alike to such losses and gains, but that neither can have the boundaries of his domain changed by avulsion nor by diversion of the water effected by human agencies. Under the conditions here presented the law of Wisconsin had already determined the right of ownership in this island before the improved channel was established. In Barney v. Keokuk, 94 U. S. 338, 24 L. Ed. 224, the Supreme Court held that the beds and shores of navigable waters properly belong to the states by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water. Thus

no proprietary title to the bed of the stream, nor to any island that may subsequently be formed therein, exists in the government. Hardin v. Shedd, 190 U. S. 508–519, 23 Sup. Ct. 685, 47 L. Ed. 1156; United States v. Chandler-Dunbar Company, 209 U. S. 447–451, 28 Sup. Ct. 579, 52 L. Ed. 881, and the very recent case of Scott v. Lattig et al., 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. ——, decided by the Supreme Court February 3, 1913. The Tallas Island was formed after the admission of the states of Wisconsin and Minnesota, and subsequently to the survey and patent of the lands of Norton and Whiteside.

Applying the principles discussed to the case at bar, we find here in the St. Louis river an island, which was, prior to this arbitrary change of channel, in the state of Wisconsin, appurtenant to the land of Whiteside, to which his ownership had attached, and still adhered, unless divested by Tallas. The main channel, forming the boundary of the state, ran between this island and the Minnesota property of complainant; and the latter could have no interest in nor right to it. A human agency intervenes, and in brief space of time, by acts clearly perceptible, establishes a new navigable channel on the opposite side of this island. Can private property rights thus be divested, and the boundaries between sovereign states changed? And even though state boundaries may be changed, can the title to private property be transferred in such manner? The complainant bases his claim upon the theory that the establishment of the middle line of the main channel in navigable rivers, as the true boundary between states, has for its primary object access to navigation by both sovereignties, and hence by the riparian citizens of the respective states; that such access cannot be taken away by establishing another channel, although it is conceded that the government in its sovereign capacity has the power to change the channel, and that no riparian owner can complain.

It is well settled that the sovereign power may, while improving navigation, take away the riparian right of access without compensation. Gibson v. United States, 166 U. S. 269–272, 17 Sup. Ct. 578, 41 L. Ed. 996. Congress has power to make any improvement in aid of navigation. It may require all navigators to pass along a required channel, and may close any other channel to their passage. In the cases before the Supreme Court in Gibson v. United States, supra, and in Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126, the plaintiff's access and landing was cut off, or its use rendered less convenient. The property itself was not taken, but was subjected to the exercise of a servitude to which it had always been subject. The government by its action changed no rights of property as between individuals. Such was neither the object nor effect of the exercise of this governmental function.

In this case, then, the government had the right to make the channel improvement that it did make. It used such parts of the river bed as it needed to use, cutting away the sandbars and small islands that were regarded as obstructions to navigation, including parts of the island in controversy. In so doing it aimed to take, and did take, no property from complainant. Thus far the complainant had no rights

in this island. The government might, perhaps, have taken this entire Tallas Island for the necessities of navigation, but it did not do so; consequently title to that portion which was left, after cutting the new channel, remained in Whiteside as before. The effect of complainant's contention is that this act of sovereignty created in him, as against the defendants, a proprietary right, which had no previous existence. This position seems to be in hopeless conflict alike with reason and authority. We cannot agree that human agencies can thus suddenly bring about what like acts of nature admittedly cannot accomplish. Cutting this channel was analogous to avulsion; it could not operate to change the boundary between the states of Wisconsin and Minnesota. In any view, the title to this island remains where it was before the government made this improvement, in which case the complainant cannot prevail. Nothing we have said is to be construed as limiting the power of the government of the United States in its sovereign capacity to make full use of the beds of navigable streams for the improvement of navigation.

[3] A determination of the main question in favor of Whiteside necessarily operates to decide complainant's appeal in favor of Tallas. However, other considerations would lead to the same result. Equity will not entertain a bill seeking to enforce a merely legal title to land, where there is a plain, adequate, and complete remedy at law. Hipp et al. v. Babin et al., 19 How. 271, 15 L. Ed. 633; Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873; Sanders v. Devereux, 8 C. C. A. 629, 60 Fed. 311; Jones et al. v. MacKenzie et al., 58 C. C. A. 96, 122 Fed. 390; Union Pacific R. Co. v. Cunningham (C. C.) 173 Fed. 90. Ejectment will lie by a riparian owner on a navigable stream to recover possession from an adverse claimant of an island formed by accretion in front of his shore line, although the naked title to the bed of the stream where it was formed is in the state, and complainant's right of possession is subject to any proper exercise of the sovereign power of the state in aid of navigation. Hall v. Hobart, 108 C. C. A. 348, 186 Fed. 426. It was there decided that ejectment is the proper remedy for the recovery of the possessory rights claimed here.

It is also urged that complainant, not being in possession, cannot maintain this action, and that because this is an action in rem, and the land in the state of Wisconsin, the Minnesota court is without jurisdiction for that reason. These contentions raise questions of serious moment; but, in view of the conclusion reached upon the merits of the controversy, it is deemed unnecessary to extend this discussion further.

It results that the decree of the trial court dismissing the bill as to the defendant Tallas should be affirmed. As to the defendant Whiteside the decree will be reversed, with directions that as to this defendant the bill be dismissed.

It is so ordered.