Frances **UHLHORN**, Appellant,

v.

**U. S. GYPSUM COMPANY**, Appellee.

No. 17896.

United States Court of Appeals
Eighth Circuit.

Sept. 20, 1966.

Rehearing Denied Oct. 19, 1966.

Walter P. Armstrong, Jr., of Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., for appellant; Joe C. Barrett, of Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., on the brief.

George K. Cracraft, Jr., Helena, Ark., for appellee; James S. Gilliland, of Montedonico, Gilliland, Heiskell, Davis, Canale & Glankler, Memphis, Tenn., on the brief.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This is an appeal by defendant (Frances Uhlhorn) from a decision of the District Court for the Eastern District of Arkansas holding (1) that certain land which is the subject of this litigation was situated within the State of Arkansas and that the District Court, therefore, had jurisdiction of the subject matter, and (2) that an island deed granted to appellee's (U. S. Gypsum Company) predecessor in title substantially complied with the Arkansas statutory requirements although the legislative enactment authorizing the deed's issuance had been repealed and re-enacted in different form prior to the execution of the deed.[1] We affirm.

The litigation was instituted by Gypsum as a suit to quiet title and necessitated making Uhlhorn a party defendant because she claimed the land in controvery (1) as accretions to property owned by her in Tennessee, and (2) as land adversely possessed longer that the statutory period necessary to perfect her title. A special Master was appointed and it is from his report, the District Court's opinion and the parties' briefs that we summarize and excerpt the following material facts. We select freely from these findings and recitals without documentation. For a clearer understanding of the fol-

---

1. The District Court's opinion is reported at 232 F.Supp. 994.

lowing narrative, see the inserted drawings depicting the land in controversy and the changing of channels by the river between 1933 and 1939:

The Mississippi River is a migrating, navigable stream with well defined banks on both the Tennessee and Arkansas shores. The main channel of navigation (thalweg) is the boundary between the two states except where the thalweg's action has brought into play certain rules of law as to avulsion or where the thalweg has shifted around an island. Generally, the land on the right descending bank (west bank) is in Arkansas, and the land on the left descending bank (east bank) is in Tennessee. However, because of an avulsion in 1876, Centennial Island on the right descending bank is in Tennessee and Brandywine Island on the left descending bank is in Arkansas. State of Arkansas v. State of Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1918). The area in controversy lies between the well defined banks of the Mississippi as they existed prior to 1930 and is located between the northwest front of Brandywine Island and the east front of Centennial Island. In 1930, the river flowed counterclockwise from the north and east around the north end of Brandywine Island, and then down the west side of that island, and east of Centennial Island. For some time prior to 1930, the river had been migrating north and west, eroding into the east face of Centennial Island and accreting to Brandywine Island, forming Massey Bar.

The migration constricted the channel creating a swift current and sharp bend so close to the Tennessee shore that tows had to be "broken up" and taken through "piecemeal." To alleviate this navigational hazard, the U. S. Corps of Engineers began extensive dredging operations off the head of Massey Bar and between it and Centennial Island during 1930, 1931 and 1932. Concrete revetments were placed along the Centennial Island bank retarding the erosion into Centennial Island and the accretion to Massey Bar. This main channel of navigation between the Massey Bar accretions and the Centennial shore was known as the "Bendway Channel" and was the boundary between Tennessee and Arkansas. The dredge spoils from the Bendway were discharged downstream from the cut on the outboard or distal end of the nucleus accretions to Massey Bar in the geographic area now occupied by the lands in controversy. In 1933, the Engineers attempted to open a channel across the accretions to Massey Bar between the area in controversy and the Arkansas mainland on Brandywine Island. This was the first manmade attempt to open what is hereinafter referred to as the "Pointway" Channel. Again, all dredge spoil was deposited on the land in controversy which lies between the Bendway Channel and what was later to become the Pointway Channel. Dredging was continued in 1934 and in 1936 another attempt was made to open Pointway across the Massey Bar accretions although river traffic was continuously routed through the Bendway where some maintenance dredging was conducted. In 1937, the Engineers again attempted to dredge the Pointway Channel between the area in controversy and the natural Bendway Channel by pumping the dredge spoil into the mouth of the Bendway to erect a sand dam between the head of Massey Bar and the Tennessee shore and concentrate the entire flow of the river through the artificial Pointway Channel. The dam was unsuccessful and navigation continued through the Bendway although a volume of water had been diverted through the Pointway and was gradually increasing. All efforts thus far to establish the Pointway as the major channel of navigation were unsuccessful and the latest available charts prepared by the Mississippi River Commission and the navigation instructions issued by the United States Coast Guard to Masters and Pilots navigating the Mississippi indicated that, at least through December, 1937, the main channel of navigation was still in the Bendway between the land in controversy and the Centennial shore.

Following the flood waters of 1938, however, the river abandoned the Bend-

way and for the first time voluntarily adopted the Pointway as its main channel. The Master found the shift in the thalweg to have occurred sometime between December, 1937 when the main channel was still through the Bendway and May 6, 1938 when the Engineers notified Masters and Pilots of the shift in channels and equipped the Pointway with navigational aids. Even after May, 1938, the Bendway maintained a relatively deep channel and was used by river traffic.[2] As late as 1938, there were depths at certain points in the Bendway of 25 feet. Navigation was routed through the Pointway Channel during 1940 and 1941 and additional spoil was placed at the head of the old Bendway in an effort to seal and stagnate it and concentrate all of the flow through the Pointway Channel.[3] The main channel of navigation never returned to the Bendway, although at the last available sounding it remained deeper than the Pointway.

Having been severed from its parent, the Massey Bar accretion to Brandywine Island, the land in controversy was now bounded on the east by the new and vigorous Pointway Channel and on the west by the old and stagnating Bendway Channel. It had become a sizeable land formation composed largely of dredge spoil and was identified by witnesses as Massey Towhead, Happy Valley Bar, Uhlhorn Bar, Lower Corona Bar and Willow Bar. It is hereinafter referred to by us as Massey Towhead.

We must initially dispose of Uhlhorn's challenge that the District Court, and consequently this court, was without jurisdiction to hear this case as Massey Towhead was an accretion to Corona Bar in Tennessee, and therefore lay beyond the territorial limits of the District Court. This challenge having been made, the District Court determined that Massey Towhead was within the Eastern District of Arkansas and, therefore, the court had jurisdiction of the subject matter. Clearly, the District Court had the power to make such a determination and we as a reviewing court have jurisdiction to examine the District Court's finding concerning the extent of its territorial jurisdiction. Davis v. Anderson-Tully Co., 252 F. 681 (8th Cir. 1918). Also, the issues here do not in-

---

2. Excerpt from Master's report on motion to dismiss:

"At the beginning of the low water season of 1938, the 'pointway' channel was marked for navigation by the placing of buoys and lights, and the marks for running this channel were described and published in the 'Notice to Masters and Pilots' by the U. S. Coast Guard.

"During the early part of September, it became necessary to reopen the natural 'bendway' channel. After dredging, navigation was maintained in the 'bendway' channel until 1939.

"Navigation was maintained in the 'pointway' channel during 1939 by the dredging of 162,107 cubic yards of materials. The division of flow around Massey Towhead was causing a filling of the natural channel north of the Towhead. In May, the Engineers Department Survey steamer Griffith, found minimum depths of 25 feet in the old bend and 23 feet in the 'pointway' channel.

"Traffic was maintained through the 'pointway' channel during 1940, and dur-

ing that time 555,741 cubic yards of materials were dredged. Part of this was placed in the head of the old 'bendway' channel in an effort to close off its flow and concentrate an undivided river through the 'pointway' channel. The abandoned bend was not sounded during the year. Navigation was routed through the 'pointway' channel during 1941 without the aid of dredging. Records of depths in the 'bendway' channel were not kept in 1941 or for any year thereafter. The old 'bendway' channel had been abandoned, although water continued to flow through it for some years thereafter."

3. The life of the Pointway Channel was relatively short as during this period the river was developing a new channel to the east through Brandywine Chute. This later channel was the main stream of navigation at trial date but such is not relevant to this decision as only the change of the channel from the Bendway to the Pointway concerns us.

volve the changing or establishing of the boundary line between sister states so that original jurisdiction lies with the Supreme Court of the United States. State of Virginia v. State of Tennessee, 148 U.S. 503, 13 S.Ct. 728, 37 L.Ed. 537 (1893). We simply decide the location of an established boundary. Iselin v. Meng, 269 F.2d 345 (5th Cir. 1959), cert. denied, 361 U.S. 913, 80 S.Ct. 257, 4 L. Ed.2d 183 (1959).

■ The boundary between Arkansas and Tennessee, in the immediate area involved in this litigation, was settled by the Supreme Court in State of Arkansas v. State of Tennessee, supra, where the Court concluded that:

"(1) The true boundary line between the States, aside from the question of the avulsion of 1876, is the middle of the main channel of navigation as it existed at the Treaty of Peace concluded between the United States and Great Britain in 1783, subject to such changes as have occurred since that time through natural and gradual processes.

"(2) By the avulsion of 1876 the boundary line between the States was unaffected, and remained in the middle of the former main channel of navigation, as above defined.

"(3) The boundary line should now be located according to the middle of that channel as it was at the time the current ceased to flow therein as a result of the avulsion of 1876." Id. 246 U.S. at 177, 38 S.Ct. at 306.

Once established, the boundary remains the thalweg or center of the main channel subject to its gradual migration through erosion and accretion. The crucial issue in this case is, therefore, whether the state boundary shifted from the Bendway to the Pointway by reason of the avultive processes that created Pointway.

■■ Our problem requires an examination of three rules of law well established in this country. They are (1) the rule of the thalweg; (2) the rule of avulsion; and (3) the island rule. The rule of the thalweg holds that where a navigable river is the boundary between states the true line is the middle or thread of the main channel of the river. State of Iowa v. State of Illinois, 147 U.S. 1, 13 S.Ct. 239, 37 L.Ed. 55 (1893). Later cases affirmed State of Iowa v. State of Illinois and treated the question as settled. State of Arkansas v. State of Tennessee, supra; State of Washington v. State of Oregon, 211 U.S. 127, 29 S.Ct. 47, 53 L.Ed. 118 (1908); State of Louisiana v. State of Mississippi, 202 U.S. 1, 49, 26 S.Ct. 408, 50 L.Ed. 913 (1906). The thalweg rule acknowledges a change in boundary only if accomplished by the slow, gradual, imperceptible or insensible, processes of erosion and accretion.

■ The rule of avulsion is also settled and was articulated by the Supreme Court in State of Nebraska v. State of Iowa, 143 U.S. 359, 361, 12 S.Ct. 396, 397, 36 L.Ed. 186 (1892):

"It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, 'avulsion.' * * * 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.' (Citing Gould on Waters § 159 and cases.)

" * * * Accretion, no matter to which side it adds ground, leaves the boundary still the center of the channel. Avulsion has no effect on boundary, but leaves it in the center of the old channel."

See also State of Missouri v. State of Nebraska, 196 U.S. 23, 35, 25 S.Ct. 155, 49 L.Ed. 372 (1904), where a portion of

the above excerpt was quoted with approval.

■ The island rule is an exception to the accretion and thalweg rules in that the thalweg of the original channel remains the boundary between the states even though it migrates slowly and imperceptibly from one side of an island to the other. This exception to the rule of accretion appears to have been first mentioned in State of Missouri v. State of Kentucky, 11 Wall. 395, 78 U.S. 395, 20 L.Ed. 116 (1870), and defined by this court in Davis v. Anderson-Tully Co., supra:

"The general rule is: (1) That, where the main channel of a navigable stream is the boundary between two states and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel; and that (2) where it changes by the sudden and violent process of avulsion, the boundary remains where the main channel was at the time of the avulsion, subject always to such changes as may be wrought after the avulsion by accretion or erosion while the old channel is occupied by a running stream. (Citations omitted.) But the first clause of this rule was made to govern and is applicable to cases where, by the slow and natural processes of accretion and erosion, the main channel creeps over the land between its old and its new course. To the rule stated in this clause there is a well-established and rational exception. It is that when a navigable stream changes its main channel of navigation, not by creeping over the intermediate lands between the old channel and the new one, but by jumping over them or running around them and making or adopting a new course, the boundary remains in the old channel subject to subsequent changes in that channel wrought by accretion and erosion while the water

in it remains a running stream, notwithstanding the fact that the change from the old channel to the new one was wrought gradually during several years by the increase from year to year of the proportion of the waters of the river passing over the course which eventually became the new channel, and the decrease from year to year of the proportion of its waters passing through the old channel until finally the new channel became the main channel of navigation. (Citations omitted.)" Id. 252 F. at 685.

To the same effect, see Commissioners of Land Office of State of Oklahoma v. United States, 270 F. 110, 113, 114 (8th Cir. 1920) and cases therein cited.

■ The difficulty in this case lies not in the understanding of or agreement with the general rules but rather in their application to the facts here presented. The Master made certain findings of fact which the District Court adopted and which we must accept unless they are clearly erroneous. Transportation Ins. Co. v. Hamilton, 316 F.2d 294, 296 (10th Cir. 1963); H. F. Wilcox Oil & Gas Co. v. Diffie, 186 F.2d 683 (10th Cir. 1950); Howard Industries; Inc. v. Rae Motor Corp., 293 F.2d 116, 117 (7th Cir. 1961); Dyker Bldg. Co. v. United States, 86 U.S.App.D.C. 297, 182 F.2d 85 (1950).

■ The evidence was conflicting as to the character and elevation of Massey Towhead at the time the river abandoned the Bendway and selected the Pointway as its main channel. The Master found that Massey Towhead was a sizeable land formation attached to the Arkansas shore by a low water sand bar but that at the time of the shift in the channel the area was some four feet below the ordinary high water level.[4] The Master found that it was not eroded by the river but continued to grow by accretion until the change in channels. And although the

---

4. Plaintiff asserts that at the time the land was approximately one and one-half miles in length and one mile in width.

The deed at the time of its issuance conveyed to plaintiff's predecessor 705.30 acres lying above high water mark.

Master found that avultive processes caused the change, he concluded it was not a "true" avulsion because Massey Towhead, at the time of the shift, was not above ordinary high water and, therefore, not land in place. Consequently, the Master concluded that the state boundary shifted as if by erosion and accretion. We do not agree (neither did the District Court) with this conclusion. Although the Master's report indicates that he did a tremendous amount of research on the legal issue involved, he frankly stated that he had been unable to find one decision which passed squarely upon the point in this case so as to support his conclusion. We have been favored in this case with excellent briefs by both parties, and each presents arguments both vigorous and persuasive. Both parties cite numerous cases and counsel differ radically on the interpretation of the decisions. We have reviewed all cited cases with interest but find, as did the Master, that none of them involves the identical issue which the facts here present.[5] In the usual case of avulsion, land is severed and new banks are formed which enclose the river's new bed. And, in each of the island cases there seems to be no question but that the area in controversy had reached the elevation of ordinary high water and could technically be classified as an island.

We do not cite any of these many cases because we do not believe any is controlling or even persuasive upon the decision here.

■■■■ We do not think that where a state's boundary is fixed by a navigable river, such boundary can or should be changed by any action of the river except by the gradual and imperceptible process of erosion and accretion, and this we believe to be logical regardless of how the boundary happened to be originally located in the thalweg of the river. To hold otherwise would alter the scope of the doctrine of accretion as well as do violence to the teachings of the Supreme Court. This we have no right to do. A state's boundary should not be cavalierly changed simply because the process through which the river seeks a new channel cannot be considered as "true" avulsion. In most instances where a river changes by avultive processes, it has left intervening land above high water mark, but we do not think the elevation of the land mass between an old channel and a new one that is cut by avultive processes is a decisive criterion for a change in a state boundary. By all logic and reason, the boundary should not and does not change from the original thalweg except as the Supreme Court said in State of Arkansas v. State of Tennessee, supra, "by gradual process." Since there was admittedly nothing gradual here, we conclude and believe that State of Arkansas v. State of Tennessee, supra, commands that the boundary remains in the thalweg of the Bendway Channel subject to its erosion and accretions occurring prior to its stagnation and death.

■■■■ We are also of the opinion that the rule of avulsion is applicable here. Massey Towhead was on May 6, 1938 a massive land mass although infrequently submerged by some four feet when the river reached ordinary high water. Massey Towhead was not only massive but solid and compact. It resisted all efforts of the Corps of Engineers to dredge a channel across it. Furthermore, after the Engineers abandoned their intensive efforts, it remained intact after the flood of 1937. It was not until after the revetment of the Tennessee side and the flood of 1938 that the river adopted the Pointway Channel. Massey Towhead remained as it was after the channel change. It was as discernible, intact and

5. At time of submission, it was thought there was a possibility that State of Louisiana v. State of Mississippi, 384 U.S. 24, 86 S.Ct. 1250, 16 L.Ed.2d 330 (1966), might resolve this problem, but there the Master found that channel movement was by gradual erosion and accretion, and not sudden, perceptible avulsion. The Supreme Court confirmed the Master's report, and thus that case is inapposite.

identifiable after the channel change as it was before. It did not suffer erosion. Under the facts, it would be completely illogical to conclude that the rule of avulsion does not apply simply because the identifiable land was not above the high water mark.

We are not impressed with the "island" rule argument. It is not applicable here as it only applies to maintain the boundary in case of a slow and gradual change in the thalweg. The change here was sudden, and in no sense gradual.

Thus, we are convinced that no established rule requires or even permits a change in the state boundary here. If it were necessary to adopt a new rule of law, it should favor the continuation of the long existence of the state boundary rather than a change therein.

Other subsidiary issues are raised and we have carefully considered each, but conclude that an extensive discussion is not warranted. Uhlhorn, for example, contends that the land in controversy was originally a bar in the Mississippi and an accretion to Centennial Island, but the Master found upon substantial evidence that although there had been a bar in front of Centennial Island, it was completely eroded and never reappeared, and that the area in controversy was in fact at all times land connected with the Arkansas mainland and on the Arkansas side of the Bendway Channel. We find no merit in Uhlhorn's contention that the state boundary changed by the doctrine of acquiescence.

▆ Additionally, Uhlhorn challenges the validity of the deed to Gypsum's predecessor in title but we find no merit in this contention, and since a discussion would be of no value predecentwise we are content to adopt the conclusions reached by the District Court and for the reasons therein stated.

By reason of our views herein expressed, the judgment of the District Court is affirmed.