## STATE OF WASHINGTON *v.* STATE OF OREGON.

### ON PETITION FOR REHEARING.

No. 3, Original. Petition filed March 8, 1909.—Decided May 24, 1909.

*Washington* v. *Oregon*, 211 U. S. 127, reaffirmed on rehearing.

Although the volume of water and depth of a channel have constantly diminished, if it all results from process of accretion, or, as in this case, possibly from jetties constructed by governmental authority, that channel still remains the boundary line, the precise line of separation being the varying center thereof.

The settlement of boundaries is generally attended with difficulties and it is wise for adjacent States to adjust their boundaries by boundary commissions and agreements as has been done with the consent of Congress in several instances.

THE facts, which involve the boundary between the States of Washington and Oregon as the same was determined by this court in this action, 211 U. S. 127, are stated in the opinion.

The State of Washington filed a petition for a rehearing herein, upon the following points:

I. The court erred in finding and holding that the present ship channel at the entrance to the Columbia River was the old south channel.

II. The court erred in finding and holding that the former north channel still subsisted to the northward of Sand Island, and that the boundary between the States of Washington and Oregon was to the northward of said Sand Island.

III. The court erred in not finding and holding that the present single channel at the entrance to the mouth of the Columbia River was as much the former north channel of the entrance to said river as it was the former south channel, and in not giving effect as a matter of law to the said combined single channel as the boundary between the two States.

IV. The court erred in finding and holding that the Columbia

River inside the entrance was not divided by islands and in finding and holding that the testimony failed to show anything calling for consideration in respect to the ownership of the said islands.

*Mr. George Turner, Mr. E. C. Macdonald, Mr. W. P. Bell,* Attorney General of the State of Washington, and *Mr. S. H. Piles,* for complainant, in support of the petition for rehearing:

Complainant in its petition for rehearing accepts the decision of this court to the effect that the north ship channel of the Columbia River is the channel fixed by the act of Congress as the north boundary of the State of Oregon, but with all deference, begs leave to present some considerations which make against the correctness of that decision, in the hope that the court may see fit to reverse it.

It is necessary, in discussing the subject, to determine the initial starting point of the Oregon line. According to the Oregon enabling act that point must be "due west and opposite the middle of the north ship channel of the Columbia River." Does this language mean due west of that channel at a point where the channel's flow crosses a line drawn from Point Adams to Cape Disappointment, which is assumed to be the mouth of the river, or does it mean due west and opposite that channel at its mouth or sea end? Oregon claims the former, and Washington claims the latter.

The sea end of the north channel in 1851 and 1854 was within three miles of the mouth of the Columbia River. See abstract, U. S. Coast Survey Charts, 1851 and 1854; Record, p. 68. It was then within territorial waters, and if that channel was to be employed through any part of its course as a boundary between Oregon and the prospective State of Washington to the north, it was as important that it be thus employed from its sea end to its entrance into the river proper, as it was that it be employed inside the entrance. The same local territorial jurisdiction, with some unimportant qualifications, would exist over it out to the three mile limit as would exist

over it within the river banks, and the same policy which would make the channel inside the river banks the boundary would require the channel to be continued as the boundary out to its sea end.  This seems clear.  *Iowa* v. *Illinois,* 147 U. S. 1, 13, holding that the controlling consideration in this matter is that which preserves to each State equality in the right of navigation in the river.

The only permissible construction of the law is, that the line commences due west and opposite the middle of the north ship channel at its sea end, and that it extends thence easterly to the middle channel of the river inside the mouth of the river.  Such a line would divide the river mouth almost equally between Oregon and Washington and give each of them, in 1859, an equally good ship channel into the river, considerations which it may be presumed would have moved Congress. See Chart A, 211 U. S. 133.  The designation of such a line would also provide an explicable rule for continuing the dividing line up the river to Fort Walla Walla.  The term, "middle channel," as used in the law, is not materially different in meaning from the term, "mid-channel," which latter term we are told by Mr. Justice Field in *Iowa* v. *Illinois, supra,* is used interchangeably in international law with the term "middle of the river," "middle of the main channel," "the deepest channel of the river," etc.  The line we contend for, starting from the point we contend for, would not strike or follow any channel until it reached the mouth of the river proper, but would cut across the middle sands, which is an objection to it; but it is not more objectionable in that respect than the line contended for by Oregon, starting from the point it contends for, which, likewise, does not follow any channel until it reaches the mouth of the river and which cuts across Peacock Spit in order to reach that point.  Considerations of reason and propriety, addressing themselves to Congress, would all move the adoption of a line such as that we now contend for rather than the Oregon line, and we may add that the language of the law as actually passed by Congress agrees with that line in

every particular and cannot be made to agree with the Oregon line in any particular.

If the north channel is the channel contemplated by the law as the boundary, then the north ship channel inside the river, that is, the channel to the north and east of Sand Island, ceased to exist about the year 1881, or sooner; the volume of water formerly passing through that channel and constituting it, cut a new channel for itself through the middle sands south of Sand Island, and this new channel then became in fact, as well as in law, the north channel of the river. See Report of Board of Engineers for the Permanent Improvement of the Mouth of the Columbia River, October 13, 1882. Record, pp. 23, 24, 28, 29. Report of Board of Engineers on Project for Improvement of Mouth of Columbia River, dated January 24, 1903. Record, pp. 53, 54.

In the rule of law applicable to such a change in the position of a navigable channel constituting a boundary between States, there is no room for the application of the doctrine of avulsion. That doctrine applies only where the entire stream seeks a new bed. It has no application to changing channels within the original banks of the stream.

The true rule is that the middle thread of the channel must be followed wherever the channel may have shifted within the banks of the stream. *Nebraska* v. *Iowa*, 143 U. S. 359; *Iowa* v. *Illinois*, 147 U. S. 1; *Missouri* v. *Nebraska*, 196 U. S. 23; *Louisiana* v. *Mississippi*, 202 U. S. 1. It is also the rule of international law. See statement of Dr. Twiss, quoted in *Iowa* v. *Illinois*, 147 U. S. 1, 9.

The stretch of river involving all the islands and sands in controversy excepting Sand Island, extends from the mouth of the river eastward up to Three Tree Point, a distance of approximately twenty-five miles. There are only two islands in the entire lot (Desdemona Sands and Snag Island), the remainder being entirely submerged and only visible at low tide.

In determining the controversy as to these islands and sands

up the river, it will be necessary to take up and construe portions of the act of 1859 not before considered by this court.

The language of the act now to be considered is as follows: "Thence easterly to and up the middle channel of said river, and where it is divided by islands, up the middle of the widest channel thereof, to a point near Fort Walla Walla."

It cannot be supposed that there are three channels extending from the mouth of the river to Fort Walla Walla. Therefore the words "middle channel" cannot be given their literal meaning. It cannot be supposed that the north channel at the mouth of the river extends as far as Fort Walla Walla. Therefore, that channel, even if the court adheres to its former decision that that channel is the one by which the line enters the mouth of the river, cannot be the dividing line east of Sand Island. The meaning of the words "middle channel" must be the same as "mid-channel" or the middle of the main navigable channel of the river. But the phraseology changes when the law comes to deal with stretches of the river which are divided by islands. Then the language is, "up the middle of the widest channel thereof." Even here there must be a channel, so that the law does not mean the widest expanse of water between shore and island. There must also be islands in the true sense, which means bodies of land surrounded by water and above water at all times; so that there is no room for the application of the term "widest channel" except where there are such islands.

The middle of the widest channel of the river may well be construed to mean the middle of the best channel of the river. Congress would not adopt the main navigable channel of the river as the boundary between the two States throughout most of its course, and adopt a different rule for stretches of the river which are divided by islands. While in the law the term "middle channel" and "widest channel" appear to be used in opposition to each other and to mean different things, this opposition would be lessened by the interpolation of the words "of the" between the words "middle" and "channel"

so as to make the law read, "up the middle of the channel," and this is permissible, because it is evidently what the lawmakers meant.

As to the channel south of Desdemona Sands, shown on Washington exhibit "H," there never has been a time from 1859 down to the present day, when that channel has not been the main channel of the river at that point, the channel which commerce has followed. Both Jussen and Hegardt, accomplished engineers, prepared test maps which were accurate reproductions of the several maps issued by the Government, commencing with that of 1851, and according to those maps, their hydrography, topography, sailing directions, and aids to navigation marked thereon, such as beacons and buoys, the main navigable channel of the river inside the entrance of the river was now and always had been the line in red and marked in green on Washington's exhibit "H," "Channel line, 1851." This line ran to the south of Desdemona Sands. On the question of the continuance of the old north channel up along the north bank of the river, both of them testified that while there was deep water along the north bank as far up as Knappton, it dissipated itself in shoals and shallows immediately above that point, and that there never had been a channel for ocean-going vessels, along the north bank above Knappton. And further that the said middle channel was not now and had never been of sufficient depth to admit the passage of ocean-going vessels and had never been so used.

With reference to the last stretch of the river, the evidence is that from the earliest times until about 1869, the 1859, or Woody Island channel, was the only channel used for deep draft ocean-going vessels and that the better channel of the present day, was only obtained as the result of extensive dredging. The old Woody Island channel is the true boundary between the two States. It was so in 1859 and remained so until 1869. The action of the public authorities in diverting that channel cannot be permitted to have the effect of diverting the boundary line. Congress could not do that by enact-

ment, and what Congress cannot do directly a mere engineer officer cannot do indirectly. If this position be sound, then Snag Island is on the Washington side of the line and belongs to Washington. The same thing is true of most of the submerged sands in controversy, although their location is not sufficiently fixed by the evidence, with reference to the line, to enable us to identify them accurately. However, that does not seem material at this time. If the rehearing be granted and Washington's contention as to the true line be then established, the practice is that this court, on proper application, will order a survey to identify and fix, with reference to the line, all disputed points.

*Mr. A. M. Crawford,* Attorney General of the State of Oregon, *Mr. I. H. Van Winkle, Mr. Harrison Allen, Mr. C. W. Fulton* and *Mr. A. M. Smith,* for defendant *contra* the petition for rehearing:

Petitioner contends that "when the north channel has been closed and the waters diverted elsewhere, one of two results follows as a matter of law. The waters which flowed through that channel, which created and constituted it, must be followed wherever they may have been diverted within the banks of the river, and still must be treated as the north ship channel; or the north ship channel must be treated as having ceased to exist, and on the doctrine of avulsion, the boundary between Oregon and Washington must be established on the line which that channel followed in 1859."

In the case at bar, Congress, in the Oregon enabling act, 1859, fixed the boundary between the States, parties to this suit, at the point in controversy, in the middle of the north ship channel. The United States and the State of Oregon were the only sovereignties having any interest in the matter at that date, and the said act of Congress is just as binding on States formed out of territory then owned by the Federal Government, as the agreement between Kentucky and Missouri. Construed in *Missouri* v. *Kentucky,* 11 Wall. 395. In

that case this court held that if the river had subsequently turned its course, the status of the parties was not altered by it, for the channel which the river abandoned remained the boundary between the States and the island in controversy did not, in consequence of this action of the water, change its owner.

Again in the case at bar the testimony shows beyond question that Sand Island was in the territorial limits of Oregon when the State was admitted into the Union. Washington not only is bound by the Oregon enabling act of 1859, but by her legal representatives, and agents, she agreed that the boundary at the point in dispute was in the north channel, and that such agreement was ratified by the vote of the people in adopting her constitution. This being so, if the north ship channel had, as petitioner contends, so shoaled in 1889, that ocean-going vessels could neither enter nor depart from the river through it, then Washington practically agreed to the boundary being north of Sand Island, after the north channel had ceased to be a ship channel as far as large ships, or even those of moderate size, are concerned.

While in early times it may be doubtful whether Sand Island was above high water at all seasons of the year, it cannot be questioned that it has been almost continually occupied by people actually living thereon for some time prior to the admission of Washington to the present time.

The construction of a jetty changing the course of a channel should not change the boundary between States, and take an island out of one sovereignty and place it in another, when the natural washing away of the banks of a stream will not have that effect. See *Base* v. *Russel,* 86 Missouri, 209; *Nebraska* v. *Iowa,* 143 U. S. 359.

Relative to the second proposition in the petition for rehearing, there are no islands shown to exist in or near the north channel of the Columbia River, after Sand Island is passed, within that portion of the river involved in this controversy. There are sand bars in or near the south channel, and a few in

or near the north channel, partially bare at low water, but nothing coming within the definition of an island as the term is usually understood.

In discussing the meaning of the clause of that portion of § 1 of the Oregon enabling act, defining the boundary, reading as follows: "Thence easterly, to and up the middle channel of said river, and, where it is divided by islands up the middle of the widest channel thereof," etc., petitioner evidently attempts to show that the widest channel is south of Sand Island, on the theory that the act means the widest deep water, but such is not the true construction of the language employed. If the line starts as the decision herein holds, in the north channel, then it remains there, in the middle of said channel until we arrive at some point where the same is divided by islands, then up the widest channel, even if up the widest deep channel as petitioner urges, it does not bring its case within the rule it invokes. South of Sand Island, the ruling depth is not to exceed fourteen or fifteen feet, while north it is much more, and the width several times greater.

Petitioner insists that the court misconceived the facts, but does not controvert the propositions of law announced by the court in its opinion herein. The physical facts relative to Sand Island, heretofore referred to, render impossible the application of any other rule than that of the Kentucky-Missouri case, and the facts relative to Snag Island, its location, the main ship channel always having been near the north shore, the same being the north ship channel, called for in the enabling act of Oregon, and the constitution of Washington, and it being the widest channel as well as the north ship channel, and the further fact that since long prior to the admission of Washington, no attempt has been made to use the so-called Woody Island channel, but that the same was abandoned in 1881 or 1882, and that large vessels never used the same, considered with the history and surrounding circumstances preclude all suggestion of a misconception of the facts by the court, and no rehearing should be granted.

MR. JUSTICE BREWER delivered the opinion of the court.

This case was decided on November 16, 1908, substantially in favor of the State of Oregon. 211 U. S. 127. On February 17 of this year a petition for rehearing was presented by the State of Washington. On examination of that petition we entered an order directing that the parties have leave to file briefs upon the questions. They have done so, and we have reëxamined the case with great care.

There are practically two matters presented; one, whether the boundary near the mouth of the Columbia River was and is the channel north of Sand Island. We held that it was, and with that conclusion we are still satisfied. It is unnecessary to restate the reasons therefor. We may, however, refer to *Missouri* v. *Kentucky*, 11 Wall. 395, as much in point. That was a controversy between those two States as to the title of Wolf Island. The treaty between France, Spain and England in February, 1763, stipulated that the middle of the Mississippi should be the boundary between the British and French territories on the continent of North America. This was recognized by the treaty of peace with Great Britain in 1783, and different treaties since then. The boundaries of Missouri when she was admitted into the Union as a State in 1820 were fixed on this basis. Kentucky had succeeded in 1792 to the right and possession of Virginia, which, by virtue of the treaties referred to, extended to the middle of the bed of the Mississippi. The main channel of the Mississippi had been up to at least 1820 west of the island. There was testimony that since then it had changed to the east side. Nevertheless the court held that the island remained still a part of Kentucky, saying (p. 401):

"It follows, therefore, that if Wolf Island in 1763, or in 1820, or at any intermediate period between these dates, was east of this line, the jurisdiction of Kentucky rightfully attached to it. If the river has subsequently turned its course, and now runs east of the island, the status of the parties to this controversy is not altered by it, for the channel which the

river abandoned remains, as before, the boundary between the States and the island does not, in consequence of this action of the water, change its owner."

So whatever changes have come in the north channel, and although the volume of water and the depth of that channel have been constantly diminishing, yet, as all resulted from processes of accretion, or, perhaps, also of late years from the jetties constructed by Congress at the mouth of the river, the boundary is still that channel, the precise line of separation being the varying center of that channel. *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178; *Nebraska* v. *Iowa*, 143 U. S. 359; *Iowa* v. *Illinois*, 147 U. S. 1; *Missouri* v. *Nebraska*, 196 U. S. 23; *Louisiana* v. *Mississippi*, 202 U. S. 1.

The other question arises in this way. The act admitting Oregon, after naming as the commencement of the boundary "a point due west and opposite the middle of the north ship channel of the Columbia River," adds "thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof to a point near Fort Walla Walla." With reference to this we said: "The testimony fails to show anything calling for consideration in respect to the last clause in the quotation from the boundary of Oregon. The channel is not divided by islands." Now, it is alleged that there is set forth in the bill of complaint and admitted in the answer that a controversy has arisen as to the boundary lines, and that both of said States claim and assume to exercise jurisdiction over numerous islands and sands in said Columbia River, sixteen of which are enumerated by name.

While sixteen islands and sands are mentioned, yet in the brief filed by the plaintiff on the application for a rehearing it is stated that, outside of Sand Island, the title to which is, as shown in the former opinion settled by the decision of the first question, only two, Desdemona Sands and Snag Island, can be called islands, the remainder being entirely submerged and only visible at low tide. These two, therefore, are all that can come within the definition in the boundary.

That speaks of "the middle channel of said river," and counsel contend that there is no pretense of three channels, and therefore the language should properly be construed as the middle of the main channel of said river, and we are inclined to think that that is the true construction. But it must be remembered that the boundary in the first instance passes around the north of Sand Island, in what was known as the north channel, and it does not strike any channel which deserves to be called the main channel until it has passed to the eastward of Sand Island. While the testimony is not satisfactory as to the point, at the time of the admission of the State of Oregon, at which this north channel, after passing Sand Island, touched any other channel, we are of the opinion that it must have been at a point east and north of Desdemona Sands. Of course, in considering this matter we assume that the contention of the State of Washington is correct, that Desdemona Sands could have then properly been termed an island.

With reference to Snag Island, the question is a difficult one. We agree with counsel that the term "widest channel" does not mean the broadest expanse of water. There must be in the first instance a channel—that is, a flow of water deep enough to be used and in fact used by vessels in passing up and down the river; but it does not mean the deepest channel but simply the widest expanse of water which can reasonably be called a channel. Now, close to Snag Island there appear several channels, the principal ones being Woody Island channel and Cordell channel, both used at different times by vessels navigating the river. The Cordell channel runs to the north of Snag Island; the Woody channel to the south, while the boundary claimed by the State of Oregon runs in a channel far to the north of both Woody Island and Cordell channels.

Further, it appears that in December, 1877, the State of Oregon conveyed Snag Island, in consideration of the sum of $143.75, to J. W. and V. Cook. While of course this is not conclusive, yet taken in connection with the fact that the

State of Washington has never attempted to interfere with the jurisdiction of the State of Oregon over Snag Island, and the doubt that hangs about the position and depth and width of the various channels in the vicinity at the time of the admission of the State of Oregon, we hold that that island is within its territorial limits.

It must be borne in mind that an inquiry of this kind is attended with much difficulty. Here is a river of great width, three miles or so at certain places, whose bed is largely of sand, and whose channels have been naturally affected by the flow of the water, and also of late years by the jetties constructed by the Government in order to facilitate navigation. Congress, evidently recognizing the difficulty which attended the location of the exact boundaries, provided that the States of Washington and Oregon should have concurrent "jurisdiction in civil and criminal cases upon the Columbia River." Yet this provision does not determine the boundaries between the two States, and has proved insufficient to settle the disputes between them as to things done upon the Columbia River. *Nielsen* v. *Oregon*, 212 U. S. 315.

We may be pardoned if, in closing this opinion, we refer to the following:

"Joint Resolution To enable the States of Mississippi and Arkansas to agree upon a boundary line and to determine the jurisdiction of crimes committed on the Mississippi River and adjacent territory.

'*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of the Congress of the United States is hereby given to the States of Mississippi and Arkansas to enter into such agreement or compact as they may deem desirable or necessary, not in conflict with the Constitution of the United States, or any law thereof, to fix the boundary line between said States, where the Mississippi River now, or formerly, formed the said boundary line and to cede respectively each to the other such

tracts or parcels of the territory of each State as may have become separated from the main body thereof by changes in the course or channel of the Mississippi River and also to adjudge and settle the jurisdiction to be exercised by said States, respectively, over offenses arising out of the violation of the laws of said States upon the waters of the Mississippi River.

"Approved January 26, 1909."

Similar ones have passed Congress in reference to the boundaries between Mississippi and Louisiana and Tennessee and Arkansas. We submit to the States of Washington and Oregon whether it will not be wise for them to pursue the same course, and, with the consent of Congress, through the aid of commissioners, adjust, as far as possible, the present appropriate boundaries between the two States and their respective jurisdiction.

The petition for rehearing is

*Denied.*