DAVIS v. COLUMBIA RIVER PACKERS' ASS'N, Inc.

No. 400.

District Court, W. D. Washington, S. D.

June 5, 1931.

Welsh & Welsh, of South Bend, Wash., and F. T. Merritt, of Seattle, Wash. (E. W. Anderson, Asst. Atty. Gen., of Washington, on the brief), for plaintiff.

Kelly & MacMahon, of Tacoma, Wash., Jay Bowerman, of Portland, Or., and G. C. & A. C. Fulton, of Astoria, Or., for defendant.

CUSHMAN, District Judge.

It has been contended upon the part of the plaintiff that since the decisions in the case of Washington v. Oregon, supra, there have been such changes in the river at this point that the north channel is now south of Sand Island; that the island, while maintaining at all intermediate times its identity, somewhat like a raft has, by the withdrawal of the waters from the north to the south channel, been moved north and across the north channel. These changes include a further shoaling to the north of Sand Island than that noted in Washington v. Oregon, supra. The water north of Sand Island is generally known and shown upon the exhibits as Baker's Bay.

There is evidence tending to show that at present there is no river channel north of Sand Island, that is, there is not a continuous flow of any part of the river seaward; that from about midway of the length of Sand Island there extends across the bed of Baker's Bay toward the Washington shore a crest; that as the tide comes into the mouth of the river it flows around the west end of Sand Island to the easterly towards this crest and at the same time around the easterly end of the island then westward toward the crest to meet the first-mentioned flow and that with the ebb the water flows both ways from the crest; that barnacles are found of late upon the piling in lower Baker's Bay; that at low tide men have walked along this crest from

the main land in Washington to the north shore of Sand Island.

Defendant, in its brief, says: "Commerce in and out of Baker's Bay is controlled by controlling depth of water of about six inches at mean low tide."

Such changes have been caused by processes of erosion and accretion, and, while they may have obliterated the north channel, neverthless the boundary remains to the north of Sand Island. The following, in addition to the foregoing decisions, establish this: Indiana v. Kentucky, 136 U. S. 479–509, 10 S. Ct. 1051, 34 L. Ed. 329; Commissioners, etc., v. United States (C. C. A.) 270 F. 110–113 and 114; Davis v. Anderson-Tully Co. (C. C. A.) 252 F. 681–683 et seq. See, also, Veatch v. White (9th C. C. A.) 23 F.(2d) 69.

The fact that Sand Island at no time since the admission of Oregon has entirely disappeared distinguishes this case from that of the recent case of Louisiana v. Mississippi, 282 U. S. 458, 51 S. Ct. 197, 200, 75 L. Ed. 459, decided by the Supreme Court February 2, 1931, a case where Tullos Island had not existed as an island at all of the times in question. The court in that case found: "The preponderance of the evidence supports the master's finding that from 1882 to 1894 the river moved eastwardly, caving away Tullos Island along its western shore, until it had wiped out that island."

The location of the boundary at the place in question will next be considered; that is, at the location of the traps which, as already stated, are to the east and not north of Sand Island.

While the determination of this precise question may not demand a finding as to the boundary location north of the island, yet, on account of the fact that in some respects a river channel is a unit and because of its physical relation, as it exists, or, if no longer existing, as it last existed, to the boundary, it is not out of place to here consider that matter.

In this lower course of the river its flow is almost directly from the east toward the west.

The north jetty at the mouth of the river was begun in 1913 or 1914. Plaintiff's Exhibit No. 6; maps or charts No. 10 and No. 11 for such years, forming a part of such exhibit.

To aid the scows carrying, from up the river into Baker's Bay, the rock for the jetty, a channel to eleven feet was dredged north of Sand Island, which channel is shown upon the chart of this exhibit for the year 1914 (sheet No. 11). This dredged channel, while it would not change the channel so as to affect the location of the boundary between the states, yet the court finds that its course for the length of Sand Island approximates the location of the channel of actual navigation through the waters of Baker's Bay. At the time it was dredged and prior thereto there was no deeper or better channel for purposes of navigation through the waters of this bay than that along its course. It was the most direct course for vessels passing through Baker's Bay, and for that reason, as noted in the case of Minnesota v. Wisconsin, 252 U. S. 273, 40 S. Ct. 313, 64 L. Ed. 558, was doubtless determinative of the short direct course taken by vessels. That it still so remains is shown by the United States coast and geodetic survey chart made upon the authority of the survey of 1926 and the survey of the United States engineers to May, 1928 (1929?). Plaintiff's Exhibits 16, 31 and 41.

There still remains for consideration the location of the boundary immediately above Sand Island; that is, to the eastward.

The boundary of Oregon was, so far as here material, fixed by section 1 of the Act of Feb. 14, 1859 (11 Stat. 383), as follows: "Beginning * * * thence. * * * to a point due west and opposite the middle of the north ship channel of the Columbia River; thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof, * * * *"

The words "middle channel," in relation to the river above Sand Island, were further considered by the court upon rehearing in the case of Washington v. Oregon, 214 U. S. 205–214, 215, and 216, 29 S. Ct. 631, 53 L. Ed. 969. Concerning this, the court said:

"There are practically two matters presented: One, whether the boundary near the mouth of the Columbia river was and is the channel north of Sand island. We held that it was, and with that conclusion we are still satisfied. * * *

"The other question arises in this way. The act admitting Oregon, after naming as the commencement of the boundary 'a point due west and opposite the middle of the north ship channel of the Columbia river,' adds 'thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof to a point near Fort Walla-Walla.'

(11 Stat. at L. 383, c. 33.) With reference to this we said: "The testimony fails to show anything calling for consideration in respect to the last clause in the quotation from the boundary of Oregon. * * *

"While sixteen islands and sands are mentioned, yet, in the brief filed by the plaintiff on the application for a rehearing, it is stated that outside of Sand island, the title to which is, as shown in the former opinion, settled by the decision of the first question, only two, Desdemona sands and Snag island, can be called islands, the remainder being entirely submerged and only visible at low tide. These two, therefore, are all that can come within the definition in the boundary. *That speaks of 'the middle channel of said river,' and counsel contend that there is no pretense of three channels, and therefore the language should properly be construed as the middle of the main channel of said river, and we are inclined to think that that is the true construction. But it must be remembered that the boundary in the first instance passes around the north of Sand island, in what was known as the north channel, and it does not strike any channel which deserves to be called the main channel until it has passed to the eastward of Sand island. While the testimony is not satisfactory as to the point, at the time of the admission of the state of Oregon, at which this north channel, after passing Sand island, touched any other channel, we are of the opinion that it must have been at a point east, and north of Desdemona sands. Of course, in considering this matter, we assume that the contention of the state of Washington is correct,—that Desdemona sands could have then properly been termed an island.*" (Italics that of this, not the Supreme Court.)

Plaintiff's contention is that the deeper, better, and most frequently used channel or route out of Baker's Bay passes around the east end of Sand Island between it and the traps in question.

The defendant denies not only that there is deeper water between the traps and Sand Island, but also denies that, if it is deeper, it furnishes a better channel or the one most frequently used by vessels going in and out of Baker's Bay at its easterly entrance. The burden of showing that the "middle of the main channel" marking the boundary is now between the traps and the eastern end of Sand Island rests upon plaintiff.

There have been no changes in the eastern end of Sand Island with relation to this part of the river since the time of the conditions considered by the Supreme Court in the case of Washington v. Oregon, supra; that is, no change of a nature to substantially affect the boundary location. While the jetties at the river mouth may have contributed to the shifting to the north, toward the Washington shore, of Sand Island, there is nothing in the evidence showing that they have in any way affected the channel above Sand Island.

The island is about a mile north of its location at the time the state of Oregon was admitted to the Union. Upon rehearing of the case of Washington v. Oregon, supra, the court held the main channel to be not only north of Desdemona Sands but of Snag Island.

The most direct route from Baker's Bay to the lower end of Woody Island channel leading to the Cordell channel north of Snag Island is close to Ft. Columbia and off Point Ellis (Elice), both in Washington. On account of the controlling depth of water in Baker's Bay, any vessel passing through that bay will find at all times ample water on this route, without obstruction of any kind, save fish traps, of which there are a considerable number between the east entrance to Baker's Bay and the Ft. Columbia wharf. The number and location of these traps are shown upon Plaintiff's Exhibit No. 3. As to such vessels (that is, those passing through Baker's Bay) there is no preponderance of the evidence showing that their course generally (that is, most often) is between Sand Island and the two traps here in question, rather than to the north and east of both such traps, nor that the former affords for them the better channel.

There still remains for consideration the question of whether the first-mentioned channel is the deeper and the better in other respects.

At present, and for many years, the main channel for the purpose of navigation by large vessels has been south of Sand Island, whether they were proceeding up the river by the channel north or that south of Desdemona Sands.

Above Sand Island and up the river to the foot of Desdemona Sands and the channel entrance north of Desdemona Sands there is one wide channel; that is, the river is not, because of shoals or because of any other obstruction or for any other reason, divided into more than one channel nor was it, as shown by the river soundings, at and prior to the admission of Oregon. Sir Edward

Belcher's Survey, 1839 (Plaintiff's Exhibit No. 10, sheet 2); Wilkes' Survey of 1844 (Plaintiff's Exhibit No. 10, sheet 3); Two Bache Surveys of 1851 and 1854 (Plaintiff's Exhibit No. 10, sheets 4 and 5 respectively).

Because of the throat in the river between the bluffs above Chinook Point in Washington and those opposite and above Point Adams there is no reason to believe that at any of the times in question and long before that it has been otherwise.

While the sands which are carried down the river have been crowded into the upper entrance of this throat as far as Desdemona Light, yet for a mile or more below there has been at all times one wide channel of ample depth for vessels of any draft using the river at the time of the admission of Oregon as a state. However, if, because of the greater width of the river here as compared with the distance between the head of Sand Island and the foot of Desdemona Sands, it is to be considered that this channel "is divided by islands" that the south channel through this one wide channel to the Clatsop channel is to be viewed as one channel and the north ship channel through this one wide channel to the channel north of Desdemona Sands is to be viewed as another channel, yet, in view of the fact that Sand Island has, since the admission of Oregon, moved or been moved, nearer to the Washington shore, it does not affect the determination of this question, for, in the early charts referred to, the deeper water of the then north channel, if it is to be considered as extending as a north channel up the river beyond the east end of Sand Island, was well off the Washington shore to the south toward the Oregon shore from what is now the upper end of Sand Island. As this has remained the deeper water through the intervening years the moving of Sand Island toward the Washington shore, with the shoaling of Baker's Bay destroying the north channel as a ship channel, cannot alone be given the effect of having carried with its movement toward the Washington shore the practically unchanged deeper channel above Sand Island's eastern end; for to give such movement such an effect would be allowing the greater to be controlled by the lesser, and would be depriving the state of Washington of equality in the matter of the navigation of this part of this important waterway. Iowa v. Illinois, 147 U. S. 1, 13 S. Ct. 239, 37 L. Ed. 55; Arkansas v. Mississippi, 250 U. S. 39–45, 39 S. Ct. 422, 63 L. Ed. 832. Under circumstances such as those here existing, effect cannot be given to the purpose and intention of providing for this equality between states with a river boundary unless it be held that, where a shallowing channel forming a part of a boundary merges into a deeper channel of the boundary stream, the center of such main and deeper channel is the actual boundary rather than some shallower portion of such channel. Louisiana v. Mississippi, 202 U. S. 1–50 and 51, 26 S. Ct. 408, 50 L. Ed. 913.

It has been contended on behalf of defendant that in this particular the proper determination of this case is controlled by the decision of the Supreme Court in the case of Minnesota v. Wisconsin, 252 U. S. 273, 40 S. Ct. 313, 64 L. Ed. 558, in which that court decided that the boundary from off Grassy Point in Minnesota ran on a direct course to a point off Big Island in upper St. Louis Bay rather than by the deeper channel closer to the Minnesota shore. That case is to be distinguished from the present in that no vessels drawing more than eight feet could reach Upper St. Louis Bay from Lake Superior and that, on the direct median course through Upper St. Louis Bay found by the Supreme Court to be the principal channel of navigation, there was ample water for such vessels. A further important difference in the two cases is that the channel nearer the Minnesota shore was a narrow winding channel, as is shown by the following portion of the opinion of the Supreme Court in the foregoing case (page 280 of 252 U. S., 40 S. Ct. 313, 318): "Lower St. Louis Bay was shallow, with a ruling depth of 8 feet, and had no well-defined channel. From the deep water at the southern tip of Grassy Point a vessel drawing less than 8 feet bound north of Big Island and beyond could have turned northwest and followed the narrow winding channel near the Minnesota shore with a ruling depth of 10, possibly 8, feet, or it could have proceeded westward, approximately one mile, over a more direct course with a depth of 8 feet or more, until it came to the deeper channel about seven-eighths of a mile northeast of Big Island. * * * "

There still remains for consideration the question of fact as to whether the stream bed between the east end of Sand Island and the traps of plaintiff and defendant is lower, making a deeper channel, than on the more direct course out of the east entrance of Baker's Bay toward the channel entrance north of Desdemona Sands.

The clear preponderance of the evidence shows that it is. Plaintiff's Exhibit No. 42.

Testimony was offered on behalf of defendant to impeach the accuracy of this exhibit. While such testimony may have rendered uncertain the soundings shown thereon at certain points, yet as a whole the situation, soundings, and contour lines of the river bottom at the exact place in question are found to be substantially as shown by this exhibit.

This map shows a scour beginning in Baker's Bay to the north of the line along which the channel was dredged about 1914 through Baker's Bay already mentioned, which scour extends around the east end of Sand Island, deepening towards and to the main channel of the river to the south.

While the course of this dredged channel is not marked on Exhibit 42, yet a comparison of it with Plaintiff's Exhibit 6 (sheet 11) and Exhibits 3, 4, 16, 31, 32, 41, and 43, shows the foregoing to be true.

There is nothing in the evidence to indicate that the dredging of this channel caused the scour or brought it nearer the east end of Sand Island. If this dredging shifted in any way the location of the scour, it is reasonable to conclude that, as the dredging extended to the southeast and out of Baker's Bay and north of the two traps, the influence of an ebbing tide would be to deflect the scour further to the east than it otherwise would be, as such tide would, to some extent, tend to follow the straight line of the dredged course. This scour has doubtless been formed by the strength of the ebbing tide out of Baker's Bay. As shown by the exhibit (Plaintiff's Exhibit No. 42), all of the plaintiff's trap is in Washington, easterly of this scour. The greater part of defendant's trap is in Washington to the easterly of the center of this scour, although the northern portion of the lead is almost in the center of the scour and the west end of the trap proper at the north end of the lead extends across the scour into Oregon.

It has been contended by defendant that, on account of the swiftness of the tide around the eastern end of Sand Island, the channel west of the traps and along this scour is not as good for purposes of navigation as the course to the east and north of the traps in question. It is sufficient to say that, even if this fact, if established, would affect the determination of this case, a preponderance of the evidence shows that, notwithstanding the flow of the tide, this course is safe and suitable for purposes of navigation, and that substantially the only advantage that the course north of the traps has over it is that the more northern course is the more direct one up the river or into Baker's Bay for a boat coming down the river by the channel north of Desdemona Sands.

The court finds that the plaintiff is entitled to the injunction prayed. Sufficient evidence has been taken to show that the plaintiff has been damaged by the wrongful placing, by defendant, of its trap as alleged, but the briefs have not discussed the amount of damages. The case will therefore be noted for further hearing upon the question of plaintiff's damages, on Monday, June 22, 1931, at 2 o'clock in the afternoon.

If either party desires and will defray the expenses of a copy of Exhibit No. 42 to be secured by the clerk and attached to this opinion and the decree in order to make their meaning more clear, such will be the order, which order and any injunctional order or decree will be settled upon notice.

The clerk will notify the attorneys for the parties and the Attorney General of the state of Washington of this ruling.