## UNITED STATES v. COLUMBIA RIVER PACKERS ASS'N et al.

No. 9471.

District Court, D. Oregon.
July 6, 1935.

Carl C. Donaugh, U. S. Dist. Atty., and Edwin D. Hicks, Asst. U. S. Dist. Atty., both of Portland, Or., for United States.

Clark & Clark and Jay Bowerman, all of Portland, Or., for defendants.

CAVANAH, District Judge.

The suit is in equity, brought by the United States claiming ownership and exclusive possession of the premises lying in the Columbia river south and west of Sand Island and south and east of the main north ship-channel of the river and that the defendants be enjoined from using the same in carrying on fishing and seining operations.

The principal issue raised by the pleadings and presented by the evidence is whether the lands in dispute are accretions to Sand Island and located in the state of Oregon, and if so do they belong to the United States, and if not so located, are they a part of Peacock Spit situated in the state of Washington extending southeast from Cape Disappointment into the waters of the river and beyond the jurisdiction of this court and are held under a lease from the state of Washington by the defendants Baker's Bay Fish Company and H. J. Barbey?

It first becomes necessary to locate the boundary line between the two states which was fixed by an Act of Congress on February 14, 1859, fixing the boundary of the state of Oregon, 11 Stat. c. 33, p. 383, and at the time the act was passed the north ship-channel was south and east of Cape Disappointment and west and north of Sand Island. It was definitely located by the Supreme Court in an action brought by the state of Washington against the state of Oregon. Washington v. Oregon, 211 U. S. 127, 29 S. Ct. 47, 53 L. Ed. 118, rehearing 214 U. S. 205, 29 S. Ct. 631, 53 L. Ed. 969. And it was there determined that Sand Island was within the state of Oregon and that the center of the north ship-channel referred to in the act admitting Oregon into the Union passed north of Sand Island and was changed only as may be from time to time through the process of accretions. The physical conditions existing in the lower waters of the Columbia river at the time of the admission of the state of Oregon were discussed in the opinion of the court, and as a part of it a map or chart, the same now before us, appears showing the location of Sand Island, Cape Disappointment, Peacock Spit, Baker's Bay, and the channel and shoals of the river in 1851 and the changes in the contour and location of Sand Island at different times between 1851 and 1905. The northerly boundary line of the state of Oregon as fixed by the decision is the southerly boundary line of the state of Washington.

When we come to locate the boundary line between the two states fixed by the Supreme Court as being the center of the north ship-channel which was south and east of Cape Disappointment and west and north of Sand Island, our problem is in locating the channel south and east of Cape Disappointment and west of Sand Island as a solution of that issue of fact becomes necessary in determining the boundary line between the two states in

the area where the disputed premises are located. The channel west of Sand Island lies between it and Peacock Spit, and the sands abutting Sand Island and Peacock Spit have at times shifted. It appears that during the Civil War, President Lincoln withdrew from entry Sand Island for military purposes and at the request of the then Commander of the Columbia River District the legislative assembly of the state of Oregon on October 21, 1864, by an act ceded to the United States, Sand Island and whatever rights the state had to the lands, between high and low water, abutting on the island, and which was an unqualified grant of the fee. Sp. Laws Or. 1864, p. 72; Columbia River Packers' Association et al. v. United States et al. (C. C. A.) 29 F.(2d) 91, 92. Ever since then the United States has asserted title and right to the island and the abutting sands, and has from 1880 to and including 1932 leased the fishing sites situated along the southerly and westerly shores of the island for the purposes of drag seining operations receiving therefor large sums as rentals, some of which from the defendants, without being challenged. The channel as located by the Supreme Court, which we must adopt has shifted some from time to time from the east to the west which was caused by the shifting of sands when there were abnormal tides, but the channel, northerly, westerly, and southerly of the island still remains. The difficult problem to be solved is whether the accretions have been from Sand Island to Peacock Spit and whether the growth has been from the east to the west or from the west to the east, covering the fishing sites in controversy. They must be between high and low water and south and west of and accretions to Sand Island and owned by the United States before it should prevail. The evidence is conflicting in that respect when we come to consider the physical conditions and the changes in the contour and location of Sand Island and Peacock Spit and the shifting of the channel and the sands. A number of maps prepared by the government over a series of years commencing with the year 1839, and by others, are in evidence and have been explained by engineers and others as to the changes having taken place from year to year and from it all we find a conflict in their versions and observations as to whether the disputed fishing sites are accretions to Sand Island or Peacock Spit. There has been

a gradual shifting and growing of both the island and Peacock Spit caused by frequent storms, high-water tides, and breakers which have at times broken up the shores of the island and the sands lying in that vicinity. The tides, waves, and currents have direct access from the bar at the mouth of the river to the island. They move the sands of the island and Peacock Spit around and wash them in and out. During high-water tides, sands lying south of Cape Disappointment and west of the channel between Cape Disappointment and the island, and the sands south of the island and east of the channel separating the island and Cape Disappointment have been covered with water. The earliest date that Peacock Spit appears is in 1880, which is a body of land and sands extending south and southeast from Cape Disappointment. During the winter of 1928 and 1929 the sands of Peacock Spit were to some extent, by reason of a storm and high tides, torn apart and dissipated.

As to Sand Island, it has been in existence for a long time, and the sands abutting thereon have shifted some westerly and increased in area which was due to accretions. Adjoining it on the north are the waters of Baker's Bay, and to the south is the main channel of the river. The island itself is admitted to be within the state of Oregon but not the disputed fishing sites which defendants contend are accretions of Peacock Spit and are therefore covered by and used by them under their lease from the state of Washington. This is the crucial issue of fact in this case, and calls for a conclusion as to whether the accretions, where the disputed fishing sites are located, have been from Sand Island or from Peacock Spit, for the increase in area gives to the owner of the land on which accretions abut all the accretions thereto, and the title to the accretions extends to the point where the two bodies of land may unite.

The defendants J. H. Barbey and the Columbia River Packers Association, on March 27, 1930, executed a lease with the Secretary of War for five years commencing May 1, 1930, which was subject to revocation at will by the secretary, of the lands on the south side of Sand Island in Oregon, described as "all of that certain premises of the south shore of Sand Island, together with rights, easements and

appurtenances thereunto belonging, known as sites Nos. 1, 2, 3, 4, and 5, the northermost boundary being marked by line running due west from U. S. Monument no. 4 to the intersection with low water line; the easterly boundary is marked by line running due south through Station 'Island' to low water near the east end of Sand Island. Length of shore line approximately 18,000 feet, all as shown and described on the attached map which is made a part hereof," and the map attached to the lease located the sites as being on the south shore of Sand Island, and at a rental of $37,175 annually, and after occupying the sites under the lease for 1930 and 1931 they secured a cancellation of it and abandoned the premises beginning with 1932. Thereafter during the years 1933 and 1934 they again used the premises described in the lease without paying the United States any rental therefor. On May 7, 1928, the defendant Baker's Bay Fish Company executed a lease with the state of Washington for an annual rental of $36,000 and for a period of five years to "that portion of the tide lands of the second class, owned by the State of Washington, situate in front of, adjacent to or abutting upon the southerly side of lot 4, Section 9, township 9 north range 11 west, W. M., including Peacock Spit, lying southeasterly of the Main Channel Range, as shown upon the United States Coast and Geodetic Survey Chart No. 6151 of the Columbia River." The last-mentioned lease was renewed on December 22, 1932, covering the same lands for an annual rental of $5,000 for a period of five years, and under it the defendants assert a right to occupy the sites for seining operations. After the defendants' answer was filed, the state of Washington enacted a law prohibiting the use of drag seins in that state which seemed to have caused the defendants to appear before the State Land Board of the State of Oregon and urge the board to lease the premises. From their actions they seemed to be somewhat in doubt as to just where these disputed sites are located, for they were content in accepting, first, a lease from the United States stating that they were in the state of Oregon and owned by the United States, second, that in their lease with the state of Washington the sites were located in that state, and, third, that they are now interested in the action of the State Land Board of Oregon in leasing them as being in the state of Oregon. But however inconsistent the position of the defendants may be in that respect, the conclusion is reached under the evidence that the disputed fishing sites as described in the complaint are accretions to Sand Island and they and the adjacent tide and shore lands up to high-water line are located within the state of Oregon and are owned by the United States under the unqualified grant from the state of Oregon, after further considering the north ship-channel as an active one and has maintained approximately the same general course since 1880. The movement peculiar to Sand Island and sand bodies which are predisposed to form in the estuary of the Columbia are recognized in the decision of the Supreme Court, and the rules for location of the line of the channel were prescribed by the court: (1) The line may be located by tracing the thread of the channel as the same may have from year to year varied through process of accretion, and (2) as the same has varied by reason of changes shaped through the construction of jetties out into the river. This is significant when we consider the language used by the court: "So, whatever changes have come in the north channel, and although the volume of water and the depth of that channel have been constantly diminishing, yet, as all resulted from processes of accretion, or, perhaps, also of late years, from the jetties constructed by Congress at the mouth of the river, the boundary is still that channel, the precise line of separation being the varying center of that channel." Washington v. Oregon, on rehearing, 214 U. S. 205–215, 29 S. Ct. 631, 632, 53 L. Ed. 969. So the variation in the line of the channel may be accounted for by accretions or shaped through the construction of jetties out into the river, and when so done we must follow the line as so changed by accretions or shaped through the construction of the jetties. The evidence would not justify the conclusion that the change in the channel's course during the years it occurred was avulsion or from the fact that the sands of Peacock Spit, in the winter of 1928 and 1929, were torn apart and set afloat in the estuary of the Columbia river, or under the assumed legal status of tide lands or tide flats, nor would that fact, and because some of them united later on with the sands of Sand Island, take away from Sand Island any sands which are accretions of it in the area where the disputed fishing sites are located. Therefore, this court has jurisdiction to deter-

mine the subject-matter of the controversy as between the present parties; the defendants being resident citizens of Oregon.

In the case of Columbia River Packers' Association, Inc., et al. v. United States et al., supra, where the United States and its lessee brought suit against the State Land Board of the State of Oregon and its lessee, to establish the right and title of the United States to Sand Island, and to the tide and shore lands adjacent thereto, the Ninth Circuit Court of Appeals, after reviewing the history of the island, stated that the island was within the limits of the state of Oregon and that by the order of the President it was set apart for military purposes on April 21, 1863, and on October 24, 1864, the state of Oregon by an act granted to the United States "all the right and interest of the state of Oregon in and to the land in front of Fort Stevens and Point Adams, situate in this state, and subject to overflow between high and low tide; also to Sand Island, situate at the mouth of Columbia river in this state, the said Island being subject to overflow between high and low tide," and that although the island was never used for military purposes yet Congress passed an Act on July 28, 1892 (27 Stat. 321, 40 US CA § 303), authorizing the Secretary of War to lease the premises for a period of five years, and that pursuant to such authority the secretary had leased the island and the adjacent tide and shore land for fishing purposes since 1903, and from such leasing there had been paid to the United States upwards of $400,000 as rentals. The court said: "After the lapse of nearly 70 years it would seem that a grant such as was made by the state of Oregon in this case should not be open to further controversy, especially in view of the fact that the grantee has asserted and exercised dominion over the granted premises for upwards of 25 years. Nevertheless, the state of Oregon now contends, first, that the grant was for military or naval purposes only; and, second, that the grant has never been accepted by Congress. But the grant itself is absolute in form, without limitation or condition, and it would violate every known rule of statutory construction to ingraft upon it now any such limitation or condition as that contended for by the appellees, especially in view of the construction the parties themselves have placed upon the grant for so long a period. * * * Furthermore, long ac-quiescence by the state in the assertion of title and the exercise of dominion over the property by the United States should be deemed conclusive at this late day. Indiana v. Kentucky, 136 U. S. 479, 10 S. Ct. 1051, 34 L. Ed. 329."

While the laws of Oregon provide that tide lands over which the tide ebbs and flows from the line of the high tide to the low tide belong to the state, section 60-301, Oregon Code 1930, yet we observe that the Court of Appeals interprets the grant from the state of Oregon to the United States as conveying all of the interest of the state in and to the lands between high and low tide, and that by virtue of the absolute grant from Oregon, which was without limitation or condition, the United States acquired title and right to the lands between high and low water mark of the river, and by reason of that decision holds the full riparian rights with respect to the southerly and westerly shores of the river.

Attention has been called by the defendants to the case of United States ex rel. Charley v. McGowan et al. (D. C.) 2 F. Supp. 426, 429, which was affirmed by the Circuit Court of Appeals, 62 F.(2d) 955, relating solely to Peacock Spit located in the state of Washington as it then existed in 1928, and succeeding years. The suit was brought by the United States as guardian of certain Indians, alleging that their fishing rights under a treaty had been interfered with by the defendants, who claimed to have leased from the state of Washington, Peacock Spit, and which was at the time of leasing the sole and exclusive property of the state of Washington. Neither the opinion nor the evidence recited in it relate in any way, or affect, the area in which the fishing sites are involved in the present case, and therefore it does not determine the ownership or location of the disputed fishing sites we are now dealing with.

The further question of jurisdiction is urged by the defendants that as the states of Oregon and Washington claim an interest in the premises they are necessary parties to the present suit and, being so, that would divest the court of jurisdiction. On the eve of the trial these two states requested permission to intervene under Equity Rule 37 (28 USCA following section 723), which was denied. Had the court permitted these states to intervene,

it would have been "in subordination to, and in recognition of, the propriety of the main proceeding," which interveners must accept. Equity Rule 37; Adler v. Seaman et al. (C. C. A.) 266 F. 828; Jennings v. Smith et al. (D. C.) 242 F. 561–564. And would not have divested the court of jurisdiction, In re Veach (C. C. A.) 4 F.(2d) 334, as the intervener could not challenge the jurisdiction of the court. Wichita R. & Light Co. v. Public Utilities Commission of State of Kansas et al., 260 U. S. 48–54, 43 S. Ct. 51, 67 L. Ed. 124; King v. Barr (C. C. A.) 262 F. 56–59; Adler v. Seaman, supra; Mueller et al. v. Adler et al. (C. C. A.) 292 F. 138. The presence of the two states is not essential to a decision of the controversy between plaintiffs and defendants, for the merits of the cause can be determined without directly affecting the rights of the states or being binding upon them, Hurley v. Pusey & Jones Co. (D. C.) 274 F. 487, 488, and the court will not lose jurisdiction under such circumstances, Wichita R. & Light Co. v. Public Utilities Commission of State of Kansas, supra. The same question was commented upon by the court in the case of United States ex rel. Charley v. McGowan, supra, where the statute granting exclusive jurisdiction of all controversies of a civil nature where a state is a party was referred to, and the court there held that a case between the United States and individual and corporate citizens did not come within the exceptions. No affirmative relief was asked for in the case by the United States against the state of Washington, nor is any asked for here against either the state of Oregon or Washington. The court said: "This court may consider the rights and powers of the state in determining issues asserted by the United States against the individual and corporate defendants, claiming under rights acquired from the state, although it may not undertake to determine and enforce such rights against the state itself or its officers." The case was appealed to the Circuit Court of Appeals, and while the question of jurisdiction was not discussed in the opinion, yet both the trial and appellate courts assumed jurisdiction. United States ex rel. Charley v. McGowan, supra. If these two states claim ownership of the premises adverse to one another, they can bring a proper action in the Supreme Court who would have original jurisdiction under the Constitution and federal statute (article 3, § 2 Constitution, Section 341, title 28 USCA), as we find that the Supreme Court has exclusive jurisdiction of all controversies of a civil nature where the state is a party. Minnesota v. Hitchcock, 185 U. S. 373, 22 S. Ct. 650, 46 L. Ed. 954. Of course, the determination of the question here involved by the court as between the present parties would in no way affect or be binding upon the rights of these two states as they are not parties to the present action. After considering these principles applicable to the application to intervene and the contention of the defendants under the circumstances disclosed by the record, the court is of the opinion that it did not abuse its discretion in denying intervention which the courts hold it has in denying intervention or requiring the bringing in of the states. Acme White Lead & Color Works v. Republic Motor Truck Co., Inc. (D. C.) 284 F. 580; Equitable Trust Co. of New York v. Connecticut Brass & Mfg. Corporation et al. (C. C. A.) 290 F. 712.

In view of the reasons thus expressed and the conclusion reached, the relief prayed for by the plaintiff is granted, and the defendants are perpetually enjoined from further occupying, or using for seining operations, the disputed fishing sites as described in the complaint, and with plaintiff's costs. Findings and decree may be prepared in accordance with the conclusions reached.