The **PORT OF PORTLAND**, a municipal corporation, Plaintiff,

v.

An **ISLAND IN** the **COLUMBIA RIVER** at 45° 35′ 40″ N. and 122° 33′ West Containing approximately 70 **ACRES KNOWN AS SAND ISLAND** et al., Defendants,

and

⁃ **State of Washington, Intervening Defendant.**

**Civ. No. 70-300.**

United States District Court,
D. Oregon.

March 26, 1971.

Shuler, Rankin, Myers, Walsh & Ragen, Robert L. Myers, Portland, Or., for plaintiff.

Vergeer, Samuels, Roehr & Sweek, Duane Vergeer, Portland, Or., for Tri-Club Islands, Inc.

Williams, Montague, Stark, Hiefield & Norville, Alfred A. Hampson, Portland, Or., for Alice T. Biddle and others.

Slade Gorton, Atty. Gen., Theodore O. Torve, Asst. Atty. Gen., Olympia, for Intervening Defendant State of Wash.

### OPINION

ALFRED T. GOODWIN, District Judge:

This is an action involving conflicting grants of land from the states of Oregon and Washington. The court has jurisdiction under 28 U.S.C. § 1354 and Art. III, § 2, of the Constitution of the United States. Port of Portland v. Tri-Club Islands, Inc., 315 F.Supp. 1160 (D. Or.1970).

Most of the essential facts are agreed. The land in dispute is an island in the Columbia River known as Sand Island. The Port of Portland, a municipal corporation, claims the island under a 1970 deed from the State of Oregon. All the defendants except the intervening defendant State of Washington claim interests in the same island under a 1929 deed from the State of Washington. The State of Washington claims mineral rights under a reservation in the 1929 deed.

Sand Island emerged in the Columbia River as the result of alluvial deposits which first appeared on charts as sand bars and shoal water after both Oregon and Washington had been admitted to the Union. The island even now is not entirely stationary, but it has remained in its general location for many years.

The island is uninhabited, and during periods of high water virtually unusable. During the summer the island has value as a recreational site, and is used by the individual defendants and their invitees for recreational purposes.

Sand Island lies south of the present boundary line between the states of Oregon and Washington. The present line was established by the Oregon-Washington Columbia River Boundary Compact in 1957 and became effective in 1958. The plaintiff contends that the island has always been on the Oregon side of the interstate boundary. The defendants contend that prior to the 1957 compact the island was in the state of Washington.

In the year 1929, the State of Washington purported to convey the island to the grantee under whom the other defendants claim. There is no dispute about the description of the island nor the identity of the various grantees nor their respective rights if the 1929 deed from the State of Washington is valid.

The principal question is whether the island ever was within the geographical boundaries of the state of Washington and subject to dominion and control of that state.

The resolution of this question depends upon the location of the Oregon and Washington boundary line at the times the two states were admitted to the Union.

That portion of the Oregon Admission Act relating to the boundary between the states of Oregon and Washington in the subject area is as follows:

" * * * thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof, to a point near Fort Walla-Walla, where the forty-sixth parallel of north latitude crosses said river * * *." 11 Stat. 383.

When Washington was admitted as a state, 26 Stat. 1552, its constitution contained almost identical language, except for the substitution of the words "near the mouth of the Walla Walla river" for the words "to a point near Fort Walla-Walla." Washington Constitution, Art. XXIV, § 1.

In Washington v. Oregon, 211 U.S. 127, 29 S.Ct. 47, 53 L.Ed. 118 (1908), opinion on rehearing 214 U.S. 205, 29 S.Ct. 631, 53 L.Ed. 969 (1909), the Supreme Court of the United States was called upon to construe the boundary descriptions in the acts admitting the states. Here is what the court said in its opinion on rehearing:

"With reference to Snag Island, the question is a difficult one. We agree with counsel that the term 'widest channel' does not mean the broadest expanse of water. There must be in the first instance a channel—that is, a flow of water deep enough to be used and in fact used by vessels in passing up and down the river; but it does not mean the deepest channel but simply the widest expanse of water which can reasonably be called a channel * * *." 214 U.S. at 216, 29 S.Ct. at 632, 53 L.Ed. at 971.

The charts of the disputed area which have been received in evidence indicate that "the widest channel" has always been the channel between Sand Island and the northern (Washington) shore. Before and after Sand Island emerged as an island, the widest channel lay between the shoal water where Sand Island now is and the Washington shore.

Soundings taken in the Columbia indicate that, at all relevant times, navigable water depths existed in the north channel at either mean low water or lower low water. The charts show docks and landings along the Washington shore (including Biddle landing immediately north of Sand Island). All the evidence shows that the north channel was used for navigation, even though plaintiff concedes that during a period of several years the main ship channel went south of Sand Island.

The State of Washington apparently executed the 1929 deed under the impression that because the "main ship channel" then ran between Sand Island and Government Island, this "main ship channel" constituted the boundary regardless of the width of any other channel. This "thalweg theory", i. e., that the main channel of navigation (thalweg) is the boundary between two states, is the law in many parts of the country. See Uhlhorn v. U. S. Gypsum Company, 366 F.2d 211 (8th Cir. 1966), cert. den. 385 U.S. 1026, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967); Arkansas v. Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1918); Louisiana v. Mississippi, 202 U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913; 202 U.S. 58, 26 S.Ct. 571, 50 L.Ed. 934 (1906). But the thalweg theory has no application to the pre-1958 Oregon-Washington boundary at points where the Columbia River is divided by islands, unless the thalweg also happens to coincide with the middle of the widest navigable channel. To hold otherwise would be to ignore the clear language of the statutes as construed and applied in Washington v. Oregon, quoted above. 214 U.S. at 216, 29 S.Ct. at 632, 53 L.Ed. at 971.

Like the court in Washington v. Oregon, this court also has had to consider the evidentiary effect of a written instrument. In 1927, the State of Oregon purported to agree with the State of Washington to distribute royalties for sand and gravel taken from the bed of the Columbia River according to a line drawn on a chart in the center of the channel between Sand Island and Government Island (the "main ship channel"). According to the 1927 agreement, Oregon agreed that Washington could collect royalties for all sand and gravel taken north of that line and that Oregon could collect for all sand and gravel taken south of that line. The line on the chart referred to in the 1927 agreement supports the defendants in their contention that Oregon has never exercised dominion and control over Sand Island, and that Sand Island, being north of the line drawn on the 1927 chart, was land within the state of Washington which the State of Washington could convey to the individual defendants in this case.

In view, however, of the express language of the acts admitting the states and the construction of those statutes by the United States Supreme Court in Washington v. Oregon, I hold that the agreement between the states of Washington and Oregon in 1927 with reference to royalties for sand and gravel could not affect the legal boundary between the two states, which remained at all times until 1958 the center of the widest channel. (The Interstate Compact also adopted substantially the center line of the widest channel, but that is an unimportant coincidence as far as this case is concerned.)

I have determined from the entire record in this case that the boundary between the state of Washington and the state of Oregon in 1929 was the center of the channel running between Sand Island and the north bank of the Columbia River. Accordingly, Sand Island was within the state of Oregon at the time of the purported conveyance by the State of Washington to the individual defendants in this case.

Based upon the foregoing findings of fact, I make the following conclusions of law:

1. At all times during its existence, Sand Island has been and now is south of both the original boundary line and the boundary line established by the Oregon-Washington Columbia River Boundary Compact.

2. Since the adoption in 1958 of the Oregon-Washington Columbia River Boundary Compact, the respective rights of the states of Oregon and Washington in the various islands and bars in the Columbia River are controlled by the boundary line upon which the two states agreed.

3. The plaintiff has succeeded to the rights of the State of Oregon in Sand Island.

4. The State of Washington issued the 1929 deed as the result of a mistake. The State of Washington in 1929 had no interest in Sand Island which it could convey.

Title to the disputed land is vested in the plaintiff free and clear of all claims of defendants.

The foregoing opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).